[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 17, 2002
THOMAS K. KAHN
CLERK

_____

No. 99-13766

_____

D. C. Docket No. 98-00953-CIV-GOLD

MCARTHUR BREEDLOVE,

Petitioner-Appellant,

versus

MICHAEL W. MOORE, Secretary,
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 17, 2002)

Before TJOFLAT, BLACK and WILSON, Circuit Judges.

WILSON, Circuit Judge:

McArthur Breedlove, a Florida prisoner, appeals the district court's denial of

his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.

Breedlove was convicted in the Dade County Circuit Court on March 2, 1979 of

first degree murder, burglary, grand theft and petit theft, and was sentenced to death on the murder charge. In this appeal, Breedlove raises eight separate claims of constitutional error relating to his conviction and sentence, and argues that the district court erred in failing to grant him habeas relief on each of these claims. In the alternative, Breedlove seeks an evidentiary hearing on his first claim, which alleges that the state suppressed material evidence tending to impeach state witnesses in violation of the rule established in *Brady v. Maryland*, 373 U.S. 83 (1963). After carefully considering the briefs and the record, and after the benefit of oral argument, we conclude that none of Breedlove's claims of error warrant relief. Furthermore, we conclude that an evidentiary hearing could not assist in the resolution of Breedlove's *Brady* claim, as he could not secure habeas relief on that claim even if all of his factual allegations are proven. Therefore, we deny Breedlove's request for an evidentiary hearing on his *Brady* claim, and affirm the district court's denial of habeas relief on each of Breedlove's eight constitutional claims.

## BACKGROUND

### A.

The charges in this case arise out of the burglary of a residence in Miami, Florida on November 6, 1978. Frank Budnick, one of the occupants of the home,

was murdered in the course of the burglary.   McArthur Breedlove, a local resident, was arrested three days later, and shortly thereafter was indicted for the murder of Budnick and the attempted murder of another occupant of the house, Carol Meoni.[1]

At trial, the State proceeded on a felony murder theory, with identity being the only issue in dispute.  Meoni, the surviving occupant of the house, was unable to identify Breedlove as the assailant, though she did provide details of the struggle between the assailant and Budnick, as well as testimony concerning both her own wounds and the property that was stolen from the house (which included a rhinestone watch).  A neighbor testified that at approximately 2:30 AM,  she saw a man leaving the vicinity of the crime scene on a blue bicycle.[2]  The State then presented testimony that a blue bicycle had been stolen that evening from a nearby home.  Investigators located a blue bicycle at Breedlove's residence, some nine blocks from the Budnick home.

The most critical portion of the State's case against Breedlove came from testimony offered by the two Miami-Dade police detectives who investigated the crime, Julio Ojeda and Charles Zatrepalek.  Ojeda testified that the two quickly seized upon Breedlove as a suspect when they learned that Breedlove had been

---

[1]Breedlove's indictment also included counts of burglary, grand theft, and petit theft.

[2]The witness admitted to some degree of uncertainty about the color of the bicycle.

arrested in the area on November 8 (on an unrelated charge), and had apparently been elusive when asked about his identity. Ojeda stated that he and Zatrepalek spoke with Breedlove's mother and brother on that date at Breedlove's residence, and Breedlove's brother claimed that Breedlove had returned home on a blue bicycle on the morning of November 7 with a rhinestone watch in his possession and blood all over his pants.[3] At this point, their suspicions truly piqued, Ojeda testified that he and Zatrepalek went to the Dade County jail to speak with Breedlove himself.

Ojeda claimed the detectives began the questioning by inquiring about the stolen bicycle found at Breedlove's residence, which Breedlove adamantly denied taking. However, Breedlove quickly changed his story, and suggested that he had stolen it when he became tired while walking home after an evening out. Under continued questioning about the murder of Budnick, Breedlove apparently became agitated. Ojeda testified that Breedlove insisted that the police were trying to frame him, and Breedlove noted that the police could not prove he had been in Budnick's house, as there would be no fingerprints. When asked why there would be no fingerprints in Budnick's house, Breedlove claimed it was because he was

---

[3]Breedlove's brother's statements did not come in for their truth, but rather to show their effect on Breedlove during subsequent questioning.

"wearing socks [on his hands]." At the conclusion of this interview, Ojeda and Zatrepalek arrested Breedlove on suspicion of Budnick's murder.

Zatrepalek testified that he went to speak with Breedlove alone at the detention center on November 21, 1978. During this conversation, Breedlove admitted that he was responsible for Budnick's murder. Zatrepalek called in a court reporter, and had Breedlove make a formal statement detailing the murder and confessing his responsibility for it. The transcript of this confession was introduced as evidence at the trial.[4]

Following the detectives' testimony and the introduction of Breedlove's confession, the state concluded its case. The defense rested without calling any witnesses, and the jury convicted Breedlove of first degree murder, burglary, grand theft, and petit theft.[5]

At the penalty phase, the State called two witnesses. One, a Los Angeles police officer, testified he had arrested Breedlove for burglary and assault with intent to commit rape in 1968. A Deputy Medical Examiner testified that Budnick drowned in his own blood, suffered considerable pain, and was conscious until he

---

[4]Breedlove sought to suppress his confession on the grounds that it was obtained in violation of his right to remain silent and that Detective Zatrepalek had beaten and coerced the confession out of him.

[5]The jury acquitted Breedlove of the attempted murder of Meoni.

stumbled out of his house and fell. The defense called three mental health experts. Dr. Center testified that Breedlove suffered brain dysfunction and emotional problems. Dr. Levy testified that Breedlove suffered from neurological impairment, and that Breedlove had told him of a history of drug abuse which was consistent with the expert's belief that Breedlove was a schizophrenic. The final expert, Dr. Miller, indicated that Breedlove was schizophrenic. The State presented rebuttal experts who testified that Breedlove was not disturbed, did not suffer from brain damage, and that he had the capacity to appreciate his criminal conduct. The jury recommended that Breedlove be sentenced to death for the murder of Budnick. The trial court concurred, and imposed the death penalty on the murder charge.

## B.

At the time of the investigation and trial in Breedlove's case, Detectives Ojeda and Zatrepalek were themselves involved in extensive and serious criminal activity. A lengthy FBI investigation into the Miami-Dade Police Department's Homicide Division in the late 1970s and early 1980s revealed that some of the Division's detectives were regularly and repeatedly violating numerous federal laws. In July of 1981, a federal grand jury handed down a forty-count indictment alleging (among other things) that Ojeda and others had run the Homicide Division

as a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1967. Zatrepalek was not charged, as he had been cooperating with the government for over a year, and received immunity in exchange for his testimony against Ojeda and other detectives in the Homicide Division.

At Ojeda's federal trial, disturbing details concerning the extent of Ojeda's and Zatrepalek's criminal activities came to light. Zatrepalek testified that he and Ojeda used cocaine repeatedly, often at the Homicide Division's offices. Another detective cooperating with the state alleged that cocaine use among the homicide detectives was rampant, and that he had used cocaine with Zatrepalek and Ojeda on a number of occasions. The evidence concerning Ojeda's and Zatrepalek's criminality went far beyond allegations of drug use. In September of 1978, Zatrepalek and another detective stole cocaine from a homicide scene and sold it, with each of them pocketing some six thousand dollars from the transaction. In January of 1979, Zatrepalek, Ojeda, and others entered a private home under the ruse of being involved in an official investigation, stole some ninety-eight thousand dollars from the home, and pocketed thirty-six thousand of that, placing the rest in police property room. Ojeda was eventually convicted of conspiracy to conduct and conducting a RICO enterprise, two counts of unlawful arrest under

7

color of state law, two counts of possession of cocaine with intent to distribute, unlawful appropriation of property, conspiracy to defraud the government, and two counts of tax evasion. Ojeda received a fourteen year prison sentence, and the conviction and sentence were affirmed on appeal. *United States v. Alonso*, 740 F.2d 862, 866 (11th Cir. 1984).

The transcript of the federal trial, which has been made a part of the appellate record in the instant case, indicates that there was conflicting testimony concerning two points relevant for Breedlove's appeal. First, it is unclear when Detectives Ojeda and Zatrepalek began to suspect that their criminal activities were being investigated by federal or state authorities. Zatrepalek testified that he was not aware of any official investigations into any of his criminal activities until November of 1979. He also testified, however, that Ojeda had told him earlier (the exact date is unclear) that Ojeda felt that the Organized Crime Bureau was investigating him for some reason. Ojeda had been questioned during an Internal Affairs investigation of the Homicide Division in January of 1978; that investigation was "suspended" in July of that year. It is unclear whether Ojeda knew that the investigation had been suspended, or the extent of his alleged suspicion that his activities were being investigated by the Organized Crime Bureau or other divisions of the State Attorney's Office.

8

The record is also unclear as to the extent to which the State Attorney's Office had direct knowledge of Ojeda's and Zatrepalek's crimes and investigations into those crimes at the time of Breedlove's arrest and trial. At Ojeda's trial, the lead prosecutor in Breedlove's case, Richard Steltzer (who received immunity in exchange for his testimony at the federal trial), admitted experimenting with cocaine with detectives from the homicide division at some point between 1977 and 1979. Steltzer also testified that he had a "mental picture" of Ojeda using cocaine on "one, two, maybe three occasions." Steltzer later acknowledged that he was aware of the FBI investigation into the homicide division's operations, but he was unsure when he became aware of that fact. The record thus reflects that the State Attorney's Office had some knowledge of drug use within the Miami-Dade Police Department's homicide division, but the extent of their knowledge of other criminal activities, and their direct awareness of any investigations into those activities, is unclear.

## C.

The history of Breedlove's case, spanning the more than twenty-one years from his sentencing to the current appeal, is lengthy and complex. Our recounting

9

of it will be brief, with particular attention paid to the manner in which the Florida courts resolved Breedlove's *Brady* claim.

Breedlove's conviction and sentence were affirmed on direct appeal. *Breedlove v. State*, 413 So. 2d 1 (Fla. 1982). Breedlove's first motion for post-conviction relief (filed in 1982) raised the *Brady* issue for the first time, alleging that the prosecution suppressed evidence concerning Ojeda and Zatrepalek's criminal activities, and that this evidence could have been used to impeach the testimony of both detectives. The trial court, without holding an evidentiary hearing, rejected Breedlove's *Brady* claim. The case later reached the Florida Supreme Court. *Breedlove v. State*, 580 So. 2d 605 (Fla. 1991) (*Breedlove II*).

The Florida Supreme Court affirmed the trial court's decision to deny relief on Breedlove's *Brady* claim. The court summarized Breedlove's contentions on appeal as follows:

> Breedlove alleges that (1) Zatrepalek and Ojeda knew of their own criminal activities; (2) an assistant state attorney [Steltzer] and a police officer knew of Ojeda's using cocaine; and (3) Zatrepalek and Ojeda knew that they were being investigated by the internal affairs division. According to Breedlove, knowledge of this information should be imputed to the prosecution, which should be found to have suppressed the information. We agree with the trial court that an evidentiary hearing is not required because, even if assumed to be true, the facts alleged do not form a basis for relief.

*Id.* at 606.

10

The court's holding in *Breedlove II* rested upon two analytically distinct grounds. First, the court found that the record did not support the allegation that the prosecution "suppressed" evidence of Ojeda and Zatrepalek's criminal activities, a necessary element of a *Brady* claim. In the alternative, the Florida Supreme Court held that the allegedly suppressed evidence was not "material," and therefore could not be used as the basis for a cognizable *Brady* violation. Breedlove's petition for an evidentiary hearing was denied, as was his request for post-conviction relief.

Breedlove filed his second post-conviction motion in 1991. Breedlove raised a number of issues in this second collateral attack on his conviction and sentence, including claims of ineffective assistance of counsel at both the guilt and sentencing phases of his case. The trial court summarily denied Breedlove relief after reviewing this second Rule 3.850 motion. However, the Florida Supreme Court ordered an evidentiary hearing on the ineffectiveness at penalty phase claim. *Breedlove v. Singletary*, 595 So. 2d 8 (Fla. 1992) (*Breedlove III*). The opportunity to present evidence on this claim did Breedlove little good, as the trial court denied relief after holding the requisite evidentiary hearing. The Florida Supreme Court affirmed. *Breedlove v. State*, 692 So. 2d 874 (Fla. 1997) (*Breedlove IV*). Breedlove eventually filed a third motion for post-conviction relief, arguing that

certain language used in the jury instructions at the penalty phase of his case unfairly prejudiced him. After the trial court ordered a new sentencing hearing, the state appealed and the Florida Supreme Court reversed. *See State v. Breedlove*, 655 So. 2d 74, 76-77 (Fla. 1995) (*Breedlove V*).

Breedlove filed the current petition for a writ of habeas corpus in the Southern District of Florida in 1998. The district court denied relief without an evidentiary hearing on the *Brady* (or any other) issue. On the *Brady* issue, the district court expressly found that the Florida Supreme Court's application of *Brady* to the facts of Breedlove's case was neither contrary to, nor an unreasonable application of, federal law, and thus was entitled to deference under 28 U.S.C. § 2254 (d)(1). Breedlove was granted a certificate of appealability on all issues, and timely filed the instant appeal.

## DISCUSSION

### A.

In reviewing a district court's denial of a petition for a writ of habeas corpus, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000) (per curiam).

12

After reviewing Breedlove's petition, we find that seven of Breedlove's claims are without merit, and do not warrant extended discussion.[6]  The bulk of this opinion will address the issues surrounding Breedlove's *Brady* claim, and his plea for an evidentiary hearing on that claim.

### B.

Breedlove argues that the state failed to disclose material information relating to Ojeda and Zatrepalek's criminal conduct to the defense, and that this failure amounts to a violation of the rule the Supreme Court articulated in *Brady v. Maryland*.  The Florida Supreme Court reached the merits of this claim, and rejected it, without holding an evidentiary hearing on the matter.  The district court also declined to hold an evidentiary hearing, declaring that "an evidentiary hearing would not aid in the resolution of the *Brady* violation claim." Breedlove contends that he is entitled to relief on the *Brady* claim; in the alternative, he argues that an evidentiary hearing is warranted.  Breedlove acknowledges that he has had no

---

[6]Breedlove argues: (1) That the trial court admitted certain hearsay statements from Breedlove's mother and brother that violated his Sixth Amendment rights; (2) that his confession should have been suppressed pursuant to *Miranda v. Arizona*; (3) that his defense counsel rendered constitutionally ineffective assistance during the guilt phase of his trial; (4) that the Florida Supreme Court misapplied the harmless error standard articulated in *Chapman v. California* when evaluating Breedlove's claim of prejudicial jury instructions; (5) that defense counsel rendered ineffective assistance at the penalty phase of his trial; (6) that appellate counsel was ineffective for failing to raise certain arguments on direct appeal; and (7) that the prosecutor made improper arguments at the penalty phase.

13

opportunity to prove any facts relevant to his *Brady* claim; therefore, granting the petition on the basis of this claim, when so many facts remain in dispute, is impossible. The remainder of this opinion will address the narrower issue of whether Breedlove has made allegations sufficient to entitle him to an evidentiary hearing on his *Brady* claim.

We review a district court's decision to deny an evidentiary hearing for an abuse of discretion. *Cason v. Seckinger*, 231 F.3d 777, 781 (11th Cir. 2000).

Breedlove filed his petition for a writ of habeas corpus after the 1996 passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which modified 28 U.S.C. § 2254 in a number of important ways. One significant change the AEDPA brought to the terms of § 2254 concerns the standards governing evidentiary hearings in federal habeas cases. One purpose of the AEDPA has been to simplify and speed the federal habeas process; consistent with this goal, the AEDPA added the following provision to § 2254:

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
> (A) the claim relies on
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. 2254(e)(2).

This provision places a fairly stringent limitation on the power of the federal courts to order evidentiary hearings in habeas cases. Indeed, if a petitioner fails to develop an adequate factual record in the state courts, an evidentiary hearing could only be ordered if one of the two narrow exceptions to the general rule prohibiting such hearings applied.

However, the question of what exactly constitutes a "failure to develop" the factual basis for a claim in state court is one on which we have not spoken. The Supreme Court, however, has addressed this question in a recent opinion, and stated that a petitioner cannot be said to have "failed to develop" relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings. *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (*Williams I*). The Court noted that § 2254(e) requires habeas petitioners to be diligent in presenting the factual bases of their federal claims to state courts, and that a failure to do so will result in the denial of an evidentiary hearing in federal court (unless the statute's other stringent requirements are met). *Id*. However, the Court also pointed out that:

15

comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by 2254(e)(2).

*Id*.

In the instant case, the record clearly indicates that Breedlove sought an evidentiary hearing on his *Brady* claim at every stage of his state proceedings. The state courts denied him the opportunity to present evidence related to his *Brady* claim; therefore, he was prevented from developing a factual basis for his claim in state court. In light of this fact, § 2254(e)(2) does not preclude an evidentiary hearing in Breedlove's case.

While Breedlove's diligent efforts to obtain an evidentiary hearing in state court mean that a federal evidentiary hearing is not barred by § 2254(e)(2), it would still be appropriate to deny him an evidentiary hearing if such a hearing would not assist in the resolution of his claim. *Bolender v. Singletary*, 16 F.3d 1547, 1555 n.9 (11th Cir. 1994) ("[N]o evidentiary hearing is necessary where the proffered evidence would not affect the resolution of the claim."). Both the Florida Supreme Court and the district court found that Breedlove's allegations, even if true, would not lead to a successful *Brady* claim, and thus found an evidentiary hearing unnecessary. Of course, we have also noted that "it is well established that a habeas petitioner is entitled to an evidentiary hearing if he or she alleges facts

16

that, if proved at the hearing, would entitle petitioner to relief." *Meeks v. Singletary*, 963 F.2d 316, 319 (11th Cir. 1992) (internal quotation marks, emphasis, and citation omitted).

Therefore, in order for Breedlove to obtain an evidentiary hearing, he must demonstrate that he would be entitled to habeas relief on his *Brady* claim if his factual allegations are proven. The Florida Supreme Court addressed this question, and found that even if true, the facts alleged in support of Breedlove's *Brady* claim would not entitle Breedlove to relief. In the post AEDPA era, we do not conduct an independent review of claims that have been addressed on the merits by the state courts. The relevant standard for federal habeas review of such claims is governed by 28 U.S.C. § 2254(d)(1)

> An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court . . . unless adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. 2254(d)(1).

A state court decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court precedent, or (2) when faced with materially indistinguishable facts, arrived at a conclusion different from that of the Supreme Court. *Bottoson v.*

17

*Moore*, 234 F.3d 526, 531 (11th Cir. 2000). A state court's decision amounts to an "unreasonable application" of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the facts of petitioner's case. *Id*. This could also occur if the state court unreasonably extends, or declines to extend, a governing legal principle (as established by Supreme Court case law) to a new context. *Id.* An unreasonable application of federal law does not refer to an incorrect or erroneous application, but rather to one that is objectively unreasonable. *Williams v. Taylor*, 529U.S. 362, 410-12 (2000) (*Williams II*).

Therefore, Breedlove is not entitled to an evidentiary hearing unless he can demonstrate that his factual allegations, if proven, would indicate that the Florida Supreme Court acted contrary to, or unreasonably applied, clearly established federal law when it rejected his *Brady* claim. To conduct this analysis, it is necessary for us to first articulate the relevant principles of *Brady* and its progeny, as defined by Supreme Court case law. We can then examine the substance of Breedlove's factual allegations, and determine whether the Florida Supreme Court acted contrary to, or unreasonably applied, federal law in holding that the facts alleged could never lead to relief on the basis of a *Brady* violation.

*Brady* places an affirmative duty upon the state to reveal any "material" evidence in its possession that would tend to exculpate a defendant. *Brady*, 373 U.S. at 86-88. The state violates due process if it does not disclose any materially exculpatory information it possesses, regardless of whether the failure to disclose was in good faith. *Id.* at 87. The duty to disclose covers both exculpatory evidence and evidence tending to impeach a state witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Exculpatory or impeachment evidence is material for the purpose of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682.

Several notes about the elements of a *Brady* claim are relevant for our purposes. First, with respect to the "suppression" prong of the *Brady* test, the prosecution team generally is considered a unitary entity, and favorable information possessed by the police but unknown to the prosecutor is nonetheless subject to the *Brady* test. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that the Brady rule encompasses evidence "known only to police investigators but not the prosecutor").[7]

---

[7] Kyles did not announce a new rule of law, and its holding is thus applicable to cases that predate it. We recognized this fact in *Neeley v. Nagle*, 138 F.3d 917, 927 n.10 (11th Cir. 1998). Thus, the Florida Supreme Court order at issue in this case must comply with *Kyles* if it is to be a reasonable application of the *Brady* standard, even though the court's order predates

Secondly, the question of when evidence is "material" for *Brady* purposes has engendered much Supreme Court discussion. The meaning of "materiality" has been developed and refined in post *Brady* cases, notably in *Bagley*:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682. The issue also came up in *Kyles*, in which Justice Souter noted:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434.

As was discussed earlier ,the Florida Supreme Court rejected Breedlove's *Brady* claim on two distinct grounds. First, the court found that evidence of the detectives' criminal activities, and the investigation into those activities, could not have been suppressed by the state, as the state had no access to the information. Second, the court found that the evidence allegedly suppressed by the state could not be "material" within the definition of *Brady* and its progeny. Our task is to

---

*Kyles* by some four years.

20

determine whether Breedlove's factual allegations, if true, would demonstrate that these bases for rejecting the claim were contrary to, or an unreasonable application of, *Brady* and its progeny.

Breedlove's allegations, both before the Florida Supreme Court in his state collateral petition and in his federal habeas petition, can be succinctly stated. He alleges that: (a) the prosecution knew that Ojeda and Zatrepalek were involved in crime, and knew of past investigations into that crime, and (b) Ojeda and Zatrepalek obviously knew of their own criminal activities, and were anxious about prospective investigations into their misconduct. Breedlove claims that had he known of these criminal activities, or of any investigations into those activities, he could have questioned the detectives about it, and perhaps demonstrated that their testimony against Breedlove was motivated in part by a desire to curry favor with law enforcement authorities. Breedlove was a defendant charged with capital murder, and prosecuting a capital case is an extremely serious and sensitive undertaking for any State Attorney's Office. According to Breedlove, assistance in securing a conviction in a capital case is a plausible means of earning trust and support with relevant law enforcement authorities; therefore, Breedlove argues that if Ojeda and Zatrepalek thought that they were under threat of indictment, they may have wished to use Breedlove's case to build favor within the State Attorney's

21

Office. If Breedlove's claims are true, and the detectives really were seeking to bolster their standing with law enforcement by ensuring Breedlove's conviction, the credibility of the State's case (virtually all of which came through Ojeda and Zatrepalek) arguably could have been undermined.

Taking these factual allegations as true, we turn first to the "contrary to" prong of the § 2254 standard. The Florida Supreme Court's opinion in *Breedlove II* easily satisfies the "contrary to" clause of § 2254(d)(1). The court correctly identified *Brady* as providing the governing legal principle; it also correctly listed all of the elements of a successful *Brady* claim. *Breedlove II*, 580 So. 2d at 606. Breedlove does not cite any pre-1991case in which the Supreme Court arrived at a conclusion different from that of the Florida Supreme Court when faced with materially indistinguishable facts, and we are not aware of any such case. Given these facts, there can be no serious claim that the Florida Supreme Court's opinion is "contrary to" clearly established, pre-existing federal law.

Breedlove argues that both components of the rationale the Florida Supreme Court offered in denying his *Brady* claim are unreasonable applications of federal law, as that term is defined by § 2254(d)(1). The Florida Supreme Court couched its holding in the alternative, meaning that it found that either one of the bases of its decision in *Breedlove II* would have been sufficient standing alone to deny

22

Breedlove relief. Therefore, in order to prevail in his effort to obtain an evidentiary hearing, Breedlove must show that <u>both</u> components of the Florida Supreme Court's decision are unreasonable applications of federal law. We need not address the first base of the Florida Supreme Court's holding in *Breedlove II* (finding Breedlove could not show that state suppressed evidence) because Breedlove cannot demonstrate that the second base of that holding, relating to the materiality of the allegedly suppressed information, was objectively unreasonable.

The Florida Supreme Court found that questions into the potential biases of the Detectives (as they related to the detectives' misconduct) would be inadmissible under Florida's law of evidence. The court noted Breedlove's contention that the detectives' testimony may have been motivated by a desire to receive favorable treatment if the state were to proceed against them, and the court acknowledged the broad scope litigants were generally given under Florida evidentiary law to inquire into the possible biases of state witnesses. *Id.* at 607-08. However, the court pointed out that inquiries into potential bias are not unlimited in the Florida courts; such inquiries must not "unfairly prejudice the trier of fact against the witness or mislead the trier of fact." *Id*. at 609. Inquiry into collateral matters will not be permitted under Florida law unless it would promote the ends of justice. Because the detectives' criminal conduct was completely unrelated to the

charges against Breedlove, and because the detectives had not been indicted or convicted of any crime at the time of Breedlove's trial, the court found that questions concerning Ojeda and Zatrepalek's criminal activities would do nothing more than "raise the possibility that [the Detectives] had engaged in bad acts." *Id*. Given this finding, questions about Ojeda's and Zatrepalek's misconduct, and their knowledge of any investigations into that misconduct, would have been inadmissible at Breedlove's trial. With questions addressing the alleged bias inadmissible, the court held that Breedlove had failed to demonstrate that the suppressed evidence met the materiality prong of the *Brady* test.

Even assuming all of Breedlove's factual allegations are true, we cannot say that this decision was an unreasonable application of clearly established federal law. The Florida Supreme Court is the final arbiter of Florida evidentiary law; federal courts must respect that law absent a constitutional violation. *Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir. 1994) (per curiam). A federal habeas court may not issue the writ on the basis of a state's interpretation of its own laws and rules, absent extreme circumstances. *Pulley v. Harris*, 465 U.S. 37, 42 (1984); *McCullough v. Singletary*, 967 F.2d 530, 535-36 (11th Cir. 1992).[8] In the instant

---

[8] In some circumstances, a totally unsupportable construction of state law by a state court will be subject to review by the federal courts, if the construction amounts to an obvious subterfuge to evade consideration of a federal claim. *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975).

24

case, the Florida Supreme Court interpreted Florida's law of evidence as limiting certain sorts of queries into the prospective biases of state witnesses. We cannot review this decision unless it amounts to an egregious, unsupportable application of state law designed to frustrate Breedlove's *Brady* claim. Plainly, it is no such thing. Indeed, two years before *Breedlove II*, we noted that similar evidence of unrelated illegal activity by a police officer testifying for the state would likely not have been admissible under Florida's law of evidence, and thus immaterial for *Brady* purposes. *See Delap v. Dugger*, 890 F.2d 285, 298 (11th Cir. 1989). The Florida Supreme Court's decision that the allegedly suppressed evidence was inadmissible was completely consistent with prior Florida evidentiary law, and cannot be disturbed by this court.

Furthermore, it is clear that the Florida Supreme Court did not unreasonably apply the *Brady* standard when it found that this inadmissible evidence was not material. *Brady's* materiality standard defines evidence as "material" only if there is a reasonable probability that its disclosure would have affected the outcome of the proceeding. *Bagley*, 473 U.S. at 682. Inadmissible evidence could only rarely meet this standard – indeed, no Supreme Court case, either before or since the Florida Supreme Court's decision in *Breedlove II*, has found inadmissible evidence

25

was material for *Brady* purposes.[9] In light of this fact, it was certainly not objectively unreasonable for the Florida Supreme Court to assume that inadmissible evidence, such as the evidence at issue in *Breedlove II*, was not material under the standard articulated in *Bagley*.

In sum, Breedlove cannot demonstrate that the Florida Supreme Court was objectively unreasonable in holding that the evidence that the state allegedly suppressed was inadmissible, and thus immaterial, under *Brady* and its progeny. None of Breedlove's allegations, if proven, could change this fact. Therefore, the district court did not abuse its discretion in denying Breedlove an evidentiary hearing on his *Brady* claim, as nothing proven at that hearing could possibly assist in the resolution of Breedlove's petition for habeas relief.

## CONCLUSION

The district court correctly denied Breedlove's petition on each of his eight claims. Furthermore, the district court did not abuse its discretion in denying Breedlove an evidentiary hearing on his *Brady* claim. Breedlove's allegations with

---

[9] In *Wood v. Bartholomew*, 516 U.S. 1 (1995) (per curiam), the Supreme Court considered the question of whether inadmissible evidence could be material under *Brady*. In that case, the Court found that inadmissible evidence of a polygraph result would not have been material under *Brady*, though the court did not rule that inadmissible evidence could never satisfy *Brady's* materiality prong. We have held that inadmissible evidence may be material for *Brady* purposes if the suppressed evidence would have led to admissible evidence. *Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994).

26

respect to the *Brady* claim, even if true, would not provide a basis for relief. Therefore, we affirm the district court's decision to deny Breedlove an evidentiary hearing, and we affirm the district court's denial of Breedlove's petition for a writ of habeas corpus.

AFFIRMED.