**Henry ANDERSON, Petitioner,**

v.

**David MILLER, Superintendent, Eastern Correctional Facility, Respondent.**

No. 99–CV–1187 (FB).

United States District Court, E.D. New York.

June 13, 2002.

Barry D. Leiwant, The Legal Aid Society, Federal Defender Division, Appeal Bureau, by Edward S. Zas, New York, NY, for the Petitioner.

Charles Hynes, District Attorney, Kings County by Thomas Ross, Assistant District Attorney, Brooklyn, NY, for the Respondent.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

Petitioner, Henry Anderson ("Anderson"), brings this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254: Anderson claims that he was deprived of a fair trial because two jurors were coerced by their fellow jurors into rendering guilty verdicts.[1]

### BACKGROUND

#### I. The State Proceedings

On March 13, 1996, after a second jury trial in New York Supreme Court, Kings County, Anderson was found guilty of Criminal Sale of a Controlled Substance in the Third Degree, Criminal Possession of a Controlled Substance in the Third Degree, and Criminal Possession of a Controlled Substance in the Seventh Degree. The State presented evidence that on May 7, 1995, at 3:45 p.m., outside 266 Kosciusko Street in Brooklyn, Anderson sold an envelope containing heroin to an undercover officer in exchange for a ten-dollar bill of pre-recorded "buy" money. Trial Tr. at 607, 608, 722.

Anderson's first trial ended in a hung jury after the jury had deliberated four days. At the second trial, the subject of Anderson's petition, the jury deliberated three days, March 11–13, 1996.

On the second day of deliberations, March 12, Juror 5 sent a note to the court requesting to be discharged. The note stated: "I have served my duty and need to return to my three children (one five

months old with a flu). We are [and] will be in a 'deadlock' position *indefinitely*." *See* Trial Tr. at 1019 (emphasis in original). With the consent of both sides, the court discharged Juror 5. An alternate was designated and the jury was instructed "to begin deliberations anew." *Id.* at 1025.

Later that day, the jury sent a deadlock note to the court. The judge told the jury that he believed they had not spent "a significant amount of time . . . on deliberations," *id.* at 1036, ordered that the jury be sequestered for the night, and instructed them to continue deliberations in the morning. The next morning, the jury announced that it had reached a verdict: the foreperson stated that Anderson was guilty of counts one and two (third degree sale and third degree possession of drugs), but not guilty of count three (seventh degree drug possession). The jury was polled, at which time Juror 11 repeatedly refused to answer the court clerk's question as to whether the verdict was hers.

> THE CLERK: Juror number 11, is that your verdict? You must answer so the court reporter can take down your answer, ma'am. I'll repeat it. Juror number 11, is that your verdict?
>
> THE COURT: Juror number 11, is that your verdict, yes or no? You must answer. Is that your verdict?
>
> JUROR # 11: I don't know.
>
> THE COURT: Yes or no?
>
> JUROR # 11: I don't know.
>
> THE COURT: You don't know? You don't know if that is your verdict?
>
> JUROR # 11: I don't know.
>
> THE COURT: You don't know? All right, we'll send the jury back to resume your deliberations.

Trial Tr. at 1046.

Thirty minutes later, the jury again sent the court a note that it had reached a

---

1. Anderson has abandoned all other claims raised in his *habeas* petition. *See* Hr'g Tr. at 130–31; Pet'r's Post–Hr'g Mem. (Jan. 11, 2002).

verdict. The jury returned the same verdict as it had before, after which the court again polled the jury, this time without incident. The court, however, concluded that the verdict as to counts two and three was inconsistent:

> THE COURT: Ladies and gentlemen, the third count only requires possession. The second count requires possession with the intent to sell. You found the defendant not guilty of the third count, which only charges him with possession. You found him guilty of the second count, which requires you to find him guilty of possession with the intent to sell. You should understand that those verdicts are inconsistent.

Trial Tr. at 1061. The court sent the jury back for further deliberations.

After another thirty minutes of deliberating, the jury announced, for the third time, that it had reached a verdict: guilty on all three counts. *Id.* at 1065–66. The court once again polled the jury, accepted the verdict, and discharged the jury. Immediately afterwards, Anderson's trial counsel objected to the verdict because he believed Jurors 11 and 2 had hesitated and cried during polling. *See id.* at 1069 ("MR. MULLADY: I object to ... the taking of the verdict. Jurors # 2 and # 11 were crying and hesitant in their answers, and [Juror # ] 2 was barely audible to me.").

Soon after the jury had been discharged, Jurors 11 and 2 independently approached the defendant's attorney in the hallway outside the courtroom and told him that they had been coerced and intimidated into giving their guilty verdicts by their fellow jurors. Jurors 11 and 2 also told a court officer that they wished to speak to the court.

At an impromptu court inquiry held later that day, Juror 11 testified as follows:

> THE COURT: [Y]ou served as a juror in the case which we just completed; that being the People of the State of New York against Henry Anderson. And I received word that you wanted to speak with me.
>
> . . . .
>
> JUROR 11: I feel that I was pushed into the [verdict] that I gave.
>
> . . . .
>
> THE COURT: And who pushed you?
>
> JUROR 11: The whole group; I felt threatened by them. One time a guy almost got in a fight. They was always yelling at me. I felt afraid; they wouldn't listen to my evidence, what I said. When I asked things to be listened to they said that they didn't want to listen to it; that it would just be for me. I have a letter right here, where I asked—I was gonna send it in to you to come home yesterday; they told me that I wasn't gonna leave, they weren't gonna allow me to leave and I was afraid.
>
> . . . .
>
> THE COURT: Okay. Is there anything else you want to say?
>
> JUROR 11: Not at this moment, but that I didn't find him guilty, that I was pushed into it. Not even intimidated, I felt threatened for my life.
>
> . . . .
>
> THE COURT: Mr. Mullady, maybe you wish to talk with that juror and make any motion you deem is appropriate under the circumstances. The Court will take no further action. Okay? Thank you.

Trial Tr. at 1078–82. The letter Juror 11 referred to was dated March 12, 1996, and was addressed to "Hon. George." It stated:

> I would like to go home[.] I feel that I'm no[t] going to change my min[d] ... I live within 3 blocks of the crime. My

life might be in a major danger if I don't give the correct [verdict]. Also, I have 2 children the ages [of] 5[and] 11 at home whom I have not contacted [and] have [no] idea where they are located.

Pet'r's Ex. B. Juror 11 was the only juror to testify. Although the record is not entirely clear, it appears that the inquiry was hastily arranged in a chaotic environment, and that the other jurors, including Juror 2, had left the courthouse. The record does not reveal whether defense counsel informed the trial court of Juror 2's allegations. *See* Hr'g Tr. at 35 (Feb. 15, 2002).

Anderson thereafter moved to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30.[2] The motion was supported by affidavits from Jurors 11 and 2. Juror 11's affidavit stated, *inter alia*, that: "One juror was in my face and trying to fight me. Three court officers came and escorted him out." Pet'r's Ex. B. Juror 2's affidavit stated, *inter alia*, that:

> I ... was pressured into saying guilty.... [There] were people arguing in the jury room [as] if they wanted to hit each other, [s]aying they don't want to stay in a hotel, that they got li[v]es[, and] have better things to do....
>
> I was getting afraid because they were getting angry that I must be stupid to not know what is going on....
>
> Everyone was yelling and giving [their] opinions, and every time I would give mine everyone would scream again. I was nervous and stressed out with ev-

erybody yelling so I just went along with everybody. But then I felt guilty for doing what I did because that was on my conscience. They pressured me to change my vote because we [were] not going anywhere. I change[d] my vote because I was afraid and pressured. I'm only 20 years old and I've never been on a jury and they were hollering and calling me names. I couldn't take the pressure. I just wanted to get away.

> It was too much loud arguing[,] I couldn't think straight anymore.

*Id.*

The trial court denied Anderson's motion, without a hearing, stating that "[it] is well settled that a jury verdict may not be impeached by a juror's post-verdict affidavit or testimony absent a showing of extraordinary circumstances," and that "a verdict may not be impeached by proof of the tenor of [jury] deliberations." Resp't's Ex. D. at 2 (internal quotation marks omitted). The trial court dismissed the seventh-degree possession count as a lesser-included count, and sentenced Anderson to identical consecutive prison terms of four and one-half years to nine years for the third-degree sale and third-degree possession counts.

Anderson appealed to the New York Supreme Court, Appellate Division, Second Department. He argued, *inter alia*, that he was denied a fair trial in violation of the Fourteenth Amendment because Ju-

---

**2.** This post-verdict provision states, in pertinent part:

> At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds:
>
> \* \* \* \*
>
> 2. That during the trial there occurred, out of the presence of the court, improper

conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict....

New York Criminal Procedure Law § 330.30.

rors 11 and 2 had been coerced by other jurors to convict him. On April 13, 1998, the Second Department, over a dissent by Justice Ritter, affirmed. *See People v. Anderson,* 249 A.D.2d 405, 671 N.Y.S.2d 149 (2d Dep't 1998). The court acknowledged that "a verdict may be impeached upon a showing of improper influence;" however, it concluded that Anderson "does not raise an issue of improper influence, but rather seeks to impeach the verdict by delving into the tenor of the jury's deliberative process." *Id.* at 150. The court noted that "the alleged behavior of the other jurors was not brought to the court's attention until after the verdict was accepted and the jurors discharged...." *Id.* (citations omitted).

In dissent, Justice Ritter argued that the case implicated issues beyond "the mere tenor of the deliberations," and that the trial court "erred in denying, without a hearing, [Anderson's] motion ... to set aside the verdict...." *Id.* at 150–151. Justice Ritter acknowledged that, "in general, verdicts will be set aside only if they are the result of extraneous or outside influences affecting the deliberative process," but stated "that there is a distinction to be drawn between tumultuous and/or raucous deliberations and the presence of coercion based on a genuine perceived threat of physical violence by one juror against another...." *Id.* at 151 (citations omitted).

Anderson unsuccessfully sought leave to appeal to the New York Court of Appeals. *See People v. Anderson,* 92 N.Y.2d 877, 678 N.Y.S.2d 25, 700 N.E.2d 563 (1998). On February 26, 1999, he filed the subject petition, *pro se.* Troubled by the allegations of Jurors 11 and 2, the Court appointed counsel and ordered that an evidentiary hearing be held to "flush out precisely what transpired in the jury room so that the Court may ascertain whether the petitioner's constitutional rights have been violated." *Anderson v. Miller,* No. 99 CV 1187 (FB), 2001 WL 1182832, at *2 (E.D.N.Y. Oct. 2, 2001).

## II. The *Habeas* Hearing

At the hearing, the Court heard the testimony of Jurors 11 and 2, as well as seven of their fellow jurors and a court officer. The remaining four jurors could not be located. *See* Hr'g Tr. at 62–63 (Feb. 15, 2002).

### A. *Juror 11*

Juror 11 elaborated on her testimony before the trial court and the contents of her affidavit. She stated that her fellow jurors had threatened to "fuck [her] up" and "physically hurt" her if she did not find Anderson guilty, and that one juror had come "over to [her] to physically hit [her]." Hr'g Tr. at 7, 9 (Dec. 3, 2001). The juror who approached her, she testified, raised his hand and held it within inches of her face. She also testified that this juror was not able to hit her because he was restrained and taken out of the jury room by "some court officers." *Id.* at 12.

Juror 11 described the growing impatience of the other jurors with her refusal to cast a guilty vote, especially after the jury had been instructed to continue deliberating after Juror 11's response of "I don't know" during the second polling, *id.* at 14, and how she eventually acquiesced to voting guilty because she felt her "life [was] threatened...." *Id.* at 15. Juror 11 also testified that she attempted to hand her note for the judge to the foreperson, who "would not take it." *See* Hr'g Tr. at 28 (Jan. 28, 2002), and that other jurors told her that "they would physically hurt" her if she tried to be excused from the jury. Hr'g Tr. at 7 (Dec. 3, 2001).

**B.** *Juror 2*

Although at first Juror 2 had poor recall of the jury deliberations, after her recollection was refreshed by her affidavit she had a clearer memory about what transpired. She testified that, although she "wasn't threatened by anybody," because of the "yelling" of her fellow jurors she was afraid that they might hit her. *See* Hr'g Tr. at 36–37, 29 (Feb. 15, 2002). She explained that the atmosphere of the deliberations caused her to feel "pressure" to go along with the majority. *Id.* at 15–16. She also testified that she was fearful because she "was young and they were older than me," and because the other jurors were calling her "stupid." *Id.* at 15.

Juror 2 did not recall any jurors verbally or physically threatening any other jurors, *id.* at 26, 39, 44–45, although she did recall that at one point a court officer came into the jury room and "told everybody to lower their voices because they [were] screaming. Then he went back out and was standing in front of the door. That was about it." *Id.* at 18. She also clarified that when she wrote in her affidavit that the jurors were arguing "[as] if they wanted to hit each other," she meant that they were "arguing in each others' face[s]." *Id.* at 10.

**C.** *Other Jurors and Witnesses*

Juror 5 testified that she had requested to be excused from the jury on the second day of deliberations. She characterized the deliberations as "aggravated," Hr'g Tr. at 71 (Dec. 3, 2001); however, she testified that she did not recall any threats or violence. *Id.* at 64. When asked specifically about Juror 11, she stated that she did not recall any juror approaching her in a physical or menacing way. *Id.* at 77.

The jury foreperson testified that she remembered that Jurors 11 and 2 were holdouts, but she could not recall why they

eventually agreed to vote guilty, Hr'g Tr. at 18 (Jan. 28, 2002); nor could she remember any threatening words, gestures or incidents that occurred during deliberations. *See id.* She also testified that she did not remember Juror 11's attempt to have her note requesting excusal passed to the judge. *See id.* at 14.

The court officer assigned to Anderson's case testified that she had entered the room at one point during deliberations because "two jurors were arguing . . . like jurors do, but loud." Hr'g Tr. at 94 (Dec. 3, 2001). The officer recalled that the two jurors involved in the argument were a man and a woman, and that they "were right in each other's face yelling . . . ." *Id.* at 95. The officer did not recall escorting any of the jurors out of the jury room, *see id.* at 96; however, she did recall suggesting that the jurors stop deliberating and take a break. *See id.* The officer did not report the incident to the judge or the lawyers since she believed "[i]t was nothing that was that big that had to be reported." *Id.* at 97.

The other jurors who testified stated that the jury deliberations had been without incident. *See id.* at 51–56, 57–62, 81–84, 86–88, 90–92.

**D.** *Factual* **Habeas** *Hearing Findings*

The Court credits the testimony of Juror 2; she was candid, direct and believable; accordingly, the Court finds that, as Juror 2 testified, no juror, including Juror 11, was physically threatened in the jury room. In so finding, the Court does not credit the testimony of Juror 11 that other jurors threatened to "fuck her up" and "physically hurt her." This testimony was inconsistent with the testimony of Juror 2, her fellow hold-out juror, who had the same interest in impeaching the verdict, and all the other witnesses at the hearing.

The Court finds that Jurors 11 and 2 subjectively felt pressured into rendering guilty verdicts, but that there was no factual basis to conclude that they were objectively subject to threats of physical harm.

**DISCUSSION**

Because Anderson's petition postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Lurie v. Wittner,* 228 F.3d 113, 120–21 (2d Cir.2000).

**I.  Appropriateness of *Habeas* Hearing**

■ Preliminarily, respondent argues that the *habeas* hearing should not have been held "because the subject matter of the hearing, the alleged intimidation and coercion of [Jurors 11 and 2,] is barred under Federal Rule of Evidence [("FRE")] 606(b)." Resp't's Post–Hr'g Mem. at 1. Rule 606(b), which applies in *habeas* proceedings, *see Fields v. Woodford,* 281 F.3d 963, 975–76 (9th Cir.2002), provides:

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror. Nor may a juror's affidavit or evidence of any statement by the

juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. FRE 606(b).

■ An "outside influence" refers to "a factor originating outside of normal courtroom proceedings which influences jury deliberations, such as ... a threat against a juror." *United States v. Jones,* 132 F.3d 232, 245 (5th Cir.1998); *see also Tanner v. United States,* 483 U.S. 107, 122–23, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (Rule 606(b) does not bar " '[a juror from] testify[ing] as to ... an outside influence which improperly had been brought to bear upon a juror,' " such as " 'a threat' "); *United States v. Allen,* 736 F.Supp. 914, 919 (N.D.Ill.1990)(Rule 606(b) did not bar juror's testimony "that a juror who had been threatened informed the other jurors of the threat....").

■ Rule 606(b) prohibits jurors from giving post-verdict testimony as to whether their subjective "mental processes" were affected by the outside influence. *See Rushen v. Spain,* 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) ("A juror may testify [as to outside influences].... But a juror generally cannot testify about the mental process by which the verdict was arrived."); *see also Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) ("[A] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not how far that influence operated upon his mind."); *Loliscio v. Goord,* 263 F.3d 178, 186 (2d Cir.2001) (although jurors may testify about an outside influence, "juror[s] may not go on to testify about the effect of that [influence] on the juror's mental processes or the jury's deliberations"); *United States v. Bassler,* 651 F.2d 600, 602 (8th Cir.1981) (noting that Rule 606(b) precludes investigation into subjective effects of outside

influence on jurors). " 'Where an [outside] influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.' " *Loliscio,* 263 F.3d at 187 (quoting *Miller v. United States,* 403 F.2d 77, 83 (2d Cir.1968)).

The Court's research has not disclosed any reported case concerning the question of whether testimony of physical threats made by jurors against a fellow juror during deliberations is barred by the strictures of Rule 606(b). Because the Court has found that no jurors were physically threatened, the Court need not address this issue. The Court notes, however, that if Rule 606(b) precluded hearing juror testimony when there are credible allegations that a juror's safety was threatened by fellow jurors, it would raise serious constitutional concerns with respect to a defendant's right to a fair trial. *See, e.g., Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ("Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body."). Consequently, although the Court recognizes that it should be the rare case that justifies inquiring into the conduct of jurors after they have rendered their verdict and been discharged, *see Attridge v. Cencorp Div. Of Dover Tech. Int'l, Inc.,* 836 F.2d 113, 114 (2d Cir.1987) (noting that post-verdict inquiries into deliberative process of juries have long been considered "dangerous intrusions"), given the troubling overtones that the verdicts rendered by Jurors 11 and 2 may have been physically coerced, the Court believed that a hearing was warranted to fully explore whether Anderson's constitutional right to an uncoerced verdict may have been violated.[3]

## II.   Impeachment of the Verdict

■ Because the Court has found "that Jurors 11 and 2 subjectively felt pressured into rendering guilty verdicts, but that there was no factual basis to conclude that they were objectively subject to threats of physical harm," this case fits comfortably within the line of cases that have held that testimony about internal pressure in the jury room is incompetent to impeach a verdict under 606(b).

For example, in *Jacobson v. Henderson,* 765 F.2d 12, 13 (2d Cir.1985), the court concluded that there was no basis to impeach the verdict where there allegedly was "screaming, hysterical crying, fist banging, name calling ... the use of obscene language," and a thrown chair in the jury room. And in *United States v. Roach,* 164 F.3d 403, 413 (8th Cir.1998), the court rejected defendants' argument that they were entitled to a new trial based upon juror misconduct where a juror submitted a post-trial affidavit stating that: (1) she had been unwilling to convict defendants but that other jurors had pressured her into changing her vote; (2) one juror told her that the judge would incarcerate her if she failed to do her civic duty

---

**3.** The Court has noted in its prior decision that since Anderson did not fail to develop the factual basis of his constitutional claim in the state court proceedings, he was not barred from a *habeas* hearing by 28 U.S.C. § 2254(e)(2). *See Anderson,* 2001 WL 1182832, at * 2; *see also Breedlove v. Moore,* 279 F.3d 952, 960 (11th Cir.2002); *Nieblas v. Smith,* 204 F.3d 29, 32 (2d Cir.1999); *Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir. 1998); *McDonald v. Johnson,* 139 F.3d 1056,

1059 (5th Cir.1998); *cf. Jordan v. Lefevre,* 206 F.3d 196, 201 (2d Cir.2000) (writ granted where trial court ruled on *Batson* challenge "in a perfunctory exercise" and "[w]ithout hearing any argument from defense counsel"); *Anderson v. Cowan,* 227 F.3d 893, 901–02 (7th Cir.2000) (writ denied because defendant relying on statistics to support *Batson* challenge failed to "preserve the record of the racial composition of the venire pool").

and vote to convict; (3) there were racial overtones in the jury room; (4) she was one of two Native American jurors, and was the only holdout against convicting three Native American defendants; (5) other jurors made references to her race and one said "[i]t was ten white people versus one Indian," and (6) she was diabetic, and the other jurors told her that she could get something to eat with them after the verdict was returned. *See also United States v. Brito,* 136 F.3d 397, 414 (5th Cir.1998) (juror's affidavit that she experienced "internal coercion" due to harassment by other jurors insufficient to impeach verdict); *United States v. Tallman,* 952 F.2d 164, 166 (8th Cir.1991) (juror's claims of "harassment and insults" from other jurors insufficient to impeach verdict; "total placidity is not the nature of jury deliberation."); *United States v. Cuthel,* 903 F.2d 1381, 1383 (11th Cir.1990) (holding that "intense pressure" that jurors may be subject to in reaching verdict is "the normal dynamic of jury deliberations"); *United States v. Norton,* 867 F.2d 1354, 1366 (11th Cir.1989) (no basis to impeach verdict where juror claimed to experience "duress" during deliberations due to alleged harassment or intimidation by other jurors); *United States v. Gravely,* 840 F.2d 1156, 1159 (4th Cir.1988) (insufficient grounds to impeach verdict where jury felt "extreme pressure" to render verdict); *United States v. Casamayor,* 837 F.2d 1509, 1514 (11th Cir.1988) ("[T]he alleged harassment or intimidation of one juror by another [cannot] impeach the verdict...."); *United States v. Barber,* 668 F.2d 778, 786 (4th Cir.1982) (no basis to impeach verdict where juror claimed that foreman "scared [her] to death"); *United States v. Bassler,* 651 F.2d 600, 602 (8th Cir.1981) ("intimidation and harassment among jurors" not competent to impeach verdict); *United States v. Abcasis,* 811 F.Supp. 828, 834 (E.D.N.Y.1992) (allega-

tions that "jury felt pressured to reach a verdict" insufficient to impeach verdict).

■ The Court notes that all of these cases were decided solely under 606(b), and did not address under what circumstances constitutional principles may be offended by particular juror conduct during jury deliberations. Regardless, a juror's subjective perceptions cannot trigger constitutional concerns. In an analogous context, in assessing the appropriateness of an *Allen* charge, the Second Circuit has instructed "that the proper approach ... is to determine whether the court's statements were coercive, regardless of the subjective effect on the jurors." *United States v. Green,* 523 F.2d 229, 236 (2d Cir.1975); *see Smalls v. Batista,* 191 F.3d 272, 278–79 (2d Cir.1999) (noting the standard to be objectively " '[w]hether an *Allen* charge was appropriate in a given case hinges on whether it tends to coerce undecided jurors into reaching a verdict' "). Other examples of the irrelevancy of subjective perceptions as a constitutional benchmark abound. *See, e.g., Estate of Rosenbaum by Plotkin v. City of New York,* 975 F.Supp. 206, 215 (E.D.N.Y.1997) (noting that "the United States Supreme Court [has] defined the limits of qualified immunity in essentially objective terms by focusing on the objective reasonableness of the government official's acts, assessed in respect to the legal rules that were 'clearly established' at the time that the official action was taken.") (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *City of Indianapolis v. Edmond,* 531 U.S. 32, 45, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (" 'Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.' "); *cf. Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ("Subjective intent alone ...

362

does not make otherwise lawful conduct illegal or unconstitutional").[4]

## CONCLUSION

Anderson's petition is denied. In light of the Court's factual findings, the Court determines that a certificate of appealability will not issue 'because Anderson has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

4. The Court notes that Justice Ritter's suggestion that the subjective fear of a juror may be sufficient to impeach a verdict is inapposite here, since Justice Ritter was construing a state common law rule, rather than the application of 606(b) and federal constitutional principles.