Henry ANDERSON, Petitioner–
Appellant,

v.

David MILLER, Superintendent,
Respondent–Appellee.

Docket No. 02–2451.

United States Court of Appeals,
Second Circuit.

Argued: April 29, 2003.

Decided: Oct. 10, 2003.

Edward S. Zas, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Petitioner–Appellant.

Thomas M. Ross, Assistant District Attorney (Charles J. Hynes, District Attorney, Kings County, Jane S. Meyers and Leonard Joblove, Assistant District Attorneys, on the Brief) Brooklyn, NY, for Respondent–Appellee.

Before: VAN GRAAFEILAND, MINER, POOLER, Circuit Judges.

POOLER, Circuit Judge.

Henry Anderson appeals from the Judgment, dated June 19, 2002, of the United States District Court for the Eastern District of New York (Block, J.) denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## FACTS

### I. Anderson's Trial.

Henry Anderson was convicted on March 13, 1996, after a jury trial in New York Supreme Court for the County of Kings, Justice Norman George presiding. Specifically, Anderson was convicted of: (1) one count of Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39[1] ("the first count"); (2) one count of Criminal Possession of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.16[1] ("the second count"); and (3) one count of Criminal Possession of a Controlled Substance in the Seventh Degree, N.Y. Penal Law § 220.03 ("the third count"). The court dismissed Anderson's conviction on the third court as a lesser inclusory count.

This was Anderson's second trial arising from charges that he and an accomplice sold heroin to an undercover police officer in Brooklyn, New York on May 7, 1995.

The first trial resulted in a hung jury after four days of deliberation.

The conduct of the jury in the second trial was, to say the least, atypical. A verdict was finally accepted by the court after three days of deliberations. On the second day of deliberations, one juror, Juror No. 5, was excused after she sent a note to Justice George, which the judge read into the record as follows:

THE COURT: Counsel, with regard to the latest note from the jury, which has been shared with counsel and marked Court Exhibit number 10 and which states, "Given the fact that I am only one juror, at this point I am being treated as a prisoner. I have served my duty and need to return to my three children (one five months old with a flu). We are and will be in a deadlocked position indefinitely", underscore. "I need not want to leave to care for my children and will never try to be a juror again in life, because my rights as a citizen do not matter in the spite of the law."

Trial Transcript at 1019.[1]

Juror No. 5 was excused with the consent of the parties and Justice George then directed the jury to begin deliberations anew with an alternate juror.

On the morning of the third day of deliberations, the jury returned with a verdict convicting Anderson on the first and second counts, but acquitting him on the third count. Shortly before rendering this verdict, the jury had requested, and received from Justice George, an explanation of the elements of conviction under the third count. Trial Transcript at 1040–42.

During polling of the jury, the following colloquy took place between Juror No. 11 and the court:

THE CLERK: Juror number 11, is that your verdict? You must answer so the court reporter can take down your answer, ma'am. I'll repeat it. Juror number 11, is that your verdict?

THE COURT: Juror number 11, is that your verdict, yes or no? You must answer. Is that your verdict?

JUROR No. 11: I don't know.

THE COURT: Yes or no?

JUROR No. 11: I don't know.

THE COURT: You don't know? You don't know if that is your verdict?

JUROR No. 11: I don't know.

THE COURT: You don't know. All right, we'll send the jury back to resume your deliberations.

Trial Transcript at 1046.

After the jury exited, Justice George denied defense counsel's motion for a mistrial. Trial Transcript at 1047–48. After a recess, and in response to another motion by defense counsel, Justice George announced that, should the jury return with the same verdict "the Court will rule that such a verdict is repugnant and the Court will, without necessity of counsel having to make the argument outside the presence of the jury, take the appropriate action to send the jury back to reconsidering Counts # 2 and # 3 and to render an appropriate, consistent non-repugnant verdict." Trial Transcript at 1053.

Shortly thereafter, the jury in fact returned with the same verdict, and was polled without incident. But Justice George immediately rejected the verdict, explaining to the jury that it could not convict on the second count, which requires possession with intent to sell, and acquit on the third count, which requires

---

1. Except where noted, all of our quotations from the trial transcript, jury notes, juror affidavits, and the transcript of the district court's evidentiary hearing are rendered verbatim.

only possession. Justice George then directed the jury to continue its deliberations. Trial Transcript at 1058–62.

The jury once again returned shortly, and announced a verdict convicting Anderson on all three counts. The jury was polled, unanimously endorsed the verdict, and was released. But defense counsel urged the court not to accept the verdict:

> MR. MULLADY: Your Honor I object to the verdict. Jurors # 2 and # 11 hesitated and cried.
>
> THE COURT: I'm sorry, I can't hear you.
>
> MR. MULLADY: I object to the taking, the Court's taking of the verdict. Jurors # 2 and # 11 were crying and hesitant in their answers, and number two was barely audible to me. I object to the taking of the verdict.
>
> THE COURT: You object because the jurors were crying?
>
> MR. MULLADY: Hesitant.
>
> THE COURT: hesitant.
>
> MR. MULLADY: hesitant.
>
> THE COURT: And crying?
>
> MR. MULLADY: Yes.
>
> THE COURT: Okay. Thank you. Anything else?

Trial Transcript at 1069–70.

## II. Post–Trial Events

Anderson argues—and the Respondent does not dispute—that Juror No. 2 and Juror No. 11 both independently approached defense counsel immediately after the trial in the hallway outside of the courtroom. Later the same day, Justice George reconvened court, with counsel for both sides present, and stated that "we received a report that two jurors were down in Central Jury and had expressed a desire to talk with the Court, speak with the Court.... [O]nly one juror is present now. So I'm going to ask that juror to come in and tell us what is on her mind." Trial Transcript at 1072–73. The juror still present was Juror No. 11; the juror who had left was Juror No. 2. Juror No. 11 testified under oath, and was questioned by Justice George. We reproduce her testimony in full, omitting only Juror No. 11's actual name:

> THE COURT: [Juror No. 11], you served as a juror in the case which we just recently completed; that being the People of the State of New York against Henry Anderson. And I received word that you wanted to speak with me.
>
> [JUROR No. 11]: Yes.
>
> THE COURT: Okay.
>
> [JUROR No. 11]: I feel I that I was pushed into the testimony that I gave.
>
> THE COURT: The testimony?
>
> [JUROR No. 11]: Not the testimony, the verdict that I gave.
>
> THE COURT: And who pushed you?
>
> [JUROR No. 11]: The whole group; I felt threatened by them. One time a guy almost got in a fight. They was always yelling at me. I felt afraid; they wouldn't listen to my evidence, what I said. When I asked things to be listened to they said that they didn't want to listen to it; that it would just be for me. I have a letter right here, where I asked—I was gonna send it in to you to come home yesterday; they told me that I wasn't gonna leave, they weren't gonna allow me to leave and I was afraid.
>
> THE COURT: Anything else?
>
> [JUROR No. 11]: Also, today when we came up with our verdict there were five court officers at the door as well as this young lady in the green jacket. They had no right near our door. Somebody came up, they were leaving; I caught her jacket. Also I was just speaking to the lawyer and [Assistant District Attor-

ney] Miss Guzman or Guzeman was standing there, listening.

Also, there was testimony that I had asked for and it was not read back in the manner that I had asked for it. So also—whether there could have been a change of mind or not, there was no way my mind could have been made, it was not read back in the manner it was asked for.

THE COURT: Any testimony that was requested by a note of the jury, the Court had read back, unless the jury subsequently sent a note saying disregard it. There were a number of notes that had that indication that they no longer requested that testimony, and I did not have that testimony read back for that reason.

[JUROR No. 11]: But what happened, your Honor, there was no better way to put exactly what I needed requested. Everytime you read it, you said we needed to word it differently; this is why we did that.

I knew exactly what I needed to hear, it was written on the first piece of paper, about Stoney; it was written the way I wrote it. You kept sending it back, of course they are going to write it differently, because they didn't hear what I heard. And I was trying to get something across what I heard. Of course they are going to write it differently, I'm not the one writing it.

THE COURT: Okay. Is there anything else you want to say?

[JUROR No. 11]: Not at this moment, but that I didn't find him guilty, that I was pushed into it. Not even intimidated, I felt threatened for my life.

THE COURT: All right. Thank you very much.

Trial Transcript at 1078–81.

No request was made by counsel for any other questions to be asked of Juror No.

11, nor did counsel request to directly examine her. The "young lady in the green jacket" has not been otherwise identified in the record before us. Immediately after Juror No. 11's brief testimony, Justice George told defense counsel to "make any motion you deem is appropriate under the circumstances. The Court will take no further action." Trial Transcript at 1082.

The "letter" to Justice George referred to by Juror No. 11 has been preserved. It is dated March 12, 1996, and states in full as follows:

> Juror 11. I would like to go home I feel that I'm no going to change my mine and I live within 3 blocks of the crime. My life might be in a major danger. If I don't give the correct plea. Also I have 2 children the ages 5[and] 11 at home whom I have not contacted [and] have know idea where they are located.

### III. Post–Conviction Relief

Defense counsel subsequently made a motion to set aside the verdict. The motion was supported by affidavits of Jurors Nos. 2 and 11, made in their own handwriting, and dated March 19, 1996 and March 27, 1996, respectively. Although not explicitly attested to in the motion, it appears that each of the affidavits was solicited by defense counsel.

Juror No. 2's affidavit gives a description of each of the jury's three days of deliberation. March 11, 1996 is said to have been "a disaster" with jurors "arguing in the jury room [as] if they wanted to hit each other, ...." Juror No. 2 claims that on March 12th other jurors "were telling me you got to change your answer we want to go home" and that "I was getting afraid because they were getting angry, that I must be stupid to not know what is going on and my conscience I was

still saying not guilty." Juror No. 2 writes as follows with respect to her decision to vote for conviction on the final day of deliberations:

> I hope you gonna say guilty today because I'm tired of being here .... Everyone was yelling there opinions, and everytime [two (?) words illegible] mine everyone would scream again I was nervous and stressed out with everybody yelling so I first went along with everybody. But then I felt guilty for doing what I did because that was on my conscience. They pressured me to change my vote because we are not going anywhere. I change my vote because I was afraid and pressured, I'm only 20 yrs old and I've never been on a jury, and they were hollering and calling me names. I couldn't take the pressure I just wanted to get away.

Juror No. 2's affidavit does not identify the individual jurors involved in these exchanges. After the verdict, Juror No. 2 asserts that immediately after the jury was discharged, "I went to the phone and when I came back from using the phone I saw Henry's lawyer and stopped him to tell him that I'm was sorry I voted not guilty and that I was pressured to say guilty, ...." Juror No. 2 concludes her affidavit by declaring that "I'm giving this Sworn statement because I believe my verdict was not guilty and I was forced to say guilty."

Juror No. 11 begins her affidavit by declaring that "I'm giving this sworn statement because my vote was not guilty from the beginning." The rest of the affidavit reads as follows:

> They were screaming at me they didn't want me to have the read backs. They also told me I was not going home. On the second day I wanted to see the judge or sent a note to the judge. I was force to make up anything on a letter in

order to get away from the threats. I wrote out a note to send to the judge and they would sent they said we've gotten rid of one trouble maker, that you are going to stay until the end. I then ask them to send out a note for me and the said no. At this point I didn't know what to do. One juror was in my face trying to fight me [and] I was afraid. Three court officer came and escorted him out. when he was out they were still deliberating. This happen day two. We were sequestered day 2 for the night During dinner they told me make sure that you say guilty. Day three was the worst.

> They were yelling [and] screaming No one wanted to listen to me. They didn't to hear my reasoning for not guilty. The voting process was rush because they wanted. They were not paying attention to whether I raised my hand or not They said lets go They didn't even want to order lunch. Once I and said I don't know to they plea they [one word illegible] became irate when I said I don't know I was hoping the judge would alarm and see that something was wrong & ask what it was. He didn't he sent us back and everyone became irate & out of controlled. I [one word illegible] and wanted to leave because I was afraid. The court told to just have a cigarette. Once I went to go and have a cigarette. I saw leaving the door as well as a court clerk. I felt then I really didn't have a chance. I was by the juror not to tell the judge. I still hesitated on the last verdict. When were discharged first thing I did was look for Henry lawyer to tell him [and] the judge. I did talk to the lawyer right away [and] talk to the judge a little later under oath.

As with Juror No. 2's affidavit, Juror No. 11 identifies no individual jurors who yelled at her, or who otherwise acted ag-

gressively toward her. We presume that "the troublemaker" she refers to is Juror No. 5, the juror who was released by consent of the parties.

In a two-page order, dated May 20, 1996, Justice George denied the motion to set aside the verdict. He first asserts that "[i]t is well settled that a jury verdict may not be impeached by a juror's post-verdict affidavit or testimony absent a showing of extraordinary circumstances (*see, People v. Brown*, 48 N.Y.2d 388, 394, 423 N.Y.S.2d 461, 399 N.E.2d 51; *People v. Spencer*, 188 A.D.2d 498, 591 N.Y.S.2d 807)." Justice George then concludes that "[i]t appears that this is a case of jury afterthought and the defendant has failed to demonstrate that the alleged misconduct impaired his right to a fair trial."

Anderson's conviction was upheld by the Appellate Division, Second Department, with one dissent. In a memorandum opinion, dated April 13, 1998, the court succinctly concluded that the appeal was without merit because "the defendant does not raise an issue of improper influence [on the jury], but rather seeks to impeach the verdict by delving into the tenor of the jury's deliberative process." *People v. Anderson*, 249 A.D.2d 405, 671 N.Y.S.2d 149, 150 (2nd Dept.1998). The dissenting judge, however, favored remitting to the trial court for further investigation into the conduct of the jury. Because Juror Nos. 2 and 11 had alleged the occurrence of actual intimidation, rather than mere divisive deliberations, the dissenting judge concluded that "the record implicates issues beyond the mere tenor of deliberations that should not have been summarily resolved." *Id.* at 151 (Ritter, J., dissenting). In an order, dated July 9, 1998, the New York Court of Appeals denied leave to appeal. *People v. Anderson*, 92 N.Y.2d 877, 678 N.Y.S.2d 25, 700 N.E.2d 563 (1998).

## IV. Habeas Relief

On February 26, 1999 Anderson filed a *pro se* petition in the U.S. District Court for the Eastern District of New York for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Judge Block described his initial review of the petition as follows: "Troubled by the allegations of Jurors 11 and 2", the Court appointed counsel and ordered that an evidentiary hearing be held to "flush out precisely what transpired in the jury room so that the Court may ascertain whether the petitioner's constitutional rights have been violated." *Anderson v. Miller*, 206 F.Supp.2d 352, 357 (E.D.N.Y.2002).

Judge Block held the evidentiary hearing on December 3, 2001, which was continued on January 28 and February 15, 2002. Nine jurors and a court officer testified, and were questioned both by counsel and by Judge Block.

Juror No. 11 was the initial witness. Her testimony may fairly be called confusing. The following passage, in which Juror No. 11 recounts her desire to leave what she perceived to be a dangerous situation, proves the point:

> THE COURT: You wanted to leave for what purpose?
>
> THE WITNESS: Because I asked, requested for the judge to send back papers. Every time we requested he sent back half a sheet. What the judge would do, he wouldn't send it back. It was already a hostile environment, your Honor. Because he didn't send the papers back, they thought we would have to sleep out another night. They became even more hostile and more verbally abusive, you know. I'm sure you read in the affidavit there was a gentleman that came over to attack me.
>
> THE COURT: Verbal abuse is one thing, being put in fear—

THE WITNESS: I was in fear. Excuse my language, excuse me, they said they would fuck me up, physically hurt me. I can't say to you they physically touched me, but they threatened my life.

Hearing Transcript at 7–8. Later, Juror No. 11 testified that another juror, whom she could not now identify, raised his hand to her in a manner she took to be a "gestur[e] to physically hurt someone." Hearing Transcript at 18.

The "papers" referred to by Juror No. 11 are apparently readbacks of testimony. Juror No. 11 testified that she made requests for readbacks and that her requests were recorded "exactly" by the jury foreperson and delivered to Justice George. Hearing Transcript at 30. On the other hand, Juror No. 11 was emphatic that unspecified other jurors "wouldn't allow me" to send a note to Justice George requesting to be relieved from further deliberations. Hearing Transcript at 38. And Juror No. 11 was equally insistent that, "[o]n the end", she voted to convict because she felt physically intimidated. Hearing Transcript at 28. On the other hand, however, Juror No. 11 testified that she "wouldn't say" and could not remember whether any other juror had been subjected to intimidation. Hearing Transcript at 43.

Also testifying on the first day of the evidentiary hearing was Juror No. 5, the juror who was excused by Justice George on the second day of deliberations. As already noted, Juror No. 5 asked to be excused because her infant child was ill, but she also asserted in her note to Justice George requesting to be excused that she expected the jury to "be in a deadlocked position indefinitely." At the evidentiary hearing, Juror No. 5 testified that there was "some agitation" among jurors during deliberations, but that this was limited to "[d]ebating, but no threats." Hearing Transcript at 69–70. In particular, Juror No. 5 did not recall anyone threatening Juror No. 11. Hearing Transcript at 77. She also stated that, but for the illness of her child, she would not have asked to be excused. Hearing Transcript at 74.

Five other jurors briefly testified on the first day of the evidentiary hearing. All of them denied that intimidation or actual violence played any role in the jury's deliberations. Their testimony can be summed up in an exchange between Anderson's counsel and one of them:

Q. How did people disagree with each other?

A. How do you characterize disagreements? People said no, you're wrong. I don't see it that way. The evidence says this. The evidence says that. There was general disagreements.

Q. Did people raise their voice?

A. Yeah, I would say yeah.

Q. Did people shout?

A. Shout? I think maybe a voice was raised once or twice. You want to define that as shouting, I don't know. I would say yeah, to my recollection maybe a voice was raised.

\* \* \* \* \* \*

Q. Did anyone treat a fellow juror in a way that you would think you thought was not respectful?

A. To the best of my recollection, no.

Hearing Transcript at 82–83.

Also testifying on the first day of the evidentiary hearing was the court officer assigned to guard the jury. She testified that she could recall but a single incident when discord among the jurors reached a level where she thought her intervention was called for. And this was not a particularly serious incident:

Q. During those three days was there ever an occasion when you felt compelled to go into the jury room?

A. Once.

Q. Can you describe what happened then?

A. The jurors, I guess, were deliberating but it got loud. I could hear voices. So, I knocked on the door and told them to stop deliberating. I went in and two jurors were arguing, you know, like jurors do, but loud. I asked them would they take a break, would they like to take a break and they did. That's what happened.

\*   \*   \*   \*   \*   \*

Q. Did anybody look like they were ready to strike one of the other's?

A. No, they were right in each other's face yelling, you know.

Q. Did you feel compelled to step in in-between them?

A. No.

Hearing Transcript at 94–95.

At the continuance of the evidentiary hearing on January 28, testimony was received from the foreperson of the jury. She succinctly stated that she never refused to pass a note to Justice George, that no threats were made by any juror against another, and that the level of discord on the jury never went beyond the raising of voices. Hearing Transcript at 7, 9–10. Called back to the stand, Juror No. 11 emphatically testified that the foreperson refused to forward her request to be excused to Justice George and that "everybody said I wasn't leaving." Hearing Transcript at 28.

When the evidentiary hearing was continued on February 15, testimony was taken from Juror No. 2, the other juror besides Juror No. 11 who had submitted an affidavit stating that she did not freely vote to convict Anderson. As with Juror

No. 11, Juror No. 2's testimony is awash with ambiguity. The following exchange is typical:

Q. One final question, [Juror No. 2], was the verdict that you rendered in the case, was that the verdict of your conscience based on the evidence or was it from—was it something other than that?

A. It was basically mostly on the evidence.

THE COURT: I'm sorry?

THE WITNESS: On the evidence.

THE COURT: The verdict you rendered was on the evidence?

THE WITNESS: Most of it.

\*   \*   \*   \*   \*   \*

THE COURT: Well, was your decision based upon the evidence in the case or was it based upon your fear?

THE WITNESS: It was on my fear.

THE COURT: You would not have rendered the same verdict otherwise, is that what you are saying?

THE WITNESS: Yes.

Hearing Transcript at 28–29.

During questioning by counsel for the Respondent, Judge Block later made another attempt to elicit how Juror No. 2 decided to vote in favor of conviction:

Q. . . . . [Y]ou said that you were never threatened?

A. Right, I wasn't threatened, I was just afraid.

Q. In fact, you said no one else in that jury room was threatened; isn't that correct?

A. I don't really know what they were thinking.

THE COURT: You talk about threatened, I don't know whether you're talking about physical threats or verbal threats; my sense is that you were not threatened physically?

THE WITNESS: Right.

THE COURT: That nobody said, I'm going to hit you?

THE WITNESS: Right.

THE COURT: But the tone of the voices and everything that was happening and the jurors wanted to go home and saying I want to get out of here, you felt you had to go along with that because you were fearful that something would happen to you physically even though you were not physically threatened; is that correct?

THE WITNESS: Yes.

Hearing Transcript at 43–44.

Judge Block subsequently issued an extensive opinion denying habeas relief. He sets forth his finding as to the central factual issue on this appeal as follows:

> The Court credits the testimony of Juror 2; she was candid, direct and believable; accordingly, the Court finds that, as Juror 2 testified, no juror, including Juror 11, was physically threatened in the jury room. In so finding, the Court does not credit the testimony of Juror 11 that other jurors threatened to "fuck her up" and "physically hurt her." This testimony was inconsistent with the testimony of Juror 2, her fellow hold-out juror, who had the same interest in impeaching the verdict, and all the other witnesses at the hearing. The Court finds that Jurors 11 and 2 subjectively felt pressured into rendering guilty verdicts, but that there was no factual basis to conclude that they were objectively subject to threats of physical harm.

*Anderson v. Miller*, 206 F.Supp.2d at 358–59.

Applying the law to this finding, Judge Block held that "a juror's subjective perceptions cannot trigger constitutional concerns." *Id.* at 361. Thus, even though Juror Nos. 2 and 11 might have experienced severe emotional distress within the jury room, and immediately after the guilty verdict was rendered, Judge Block held that Anderson was tried in conformance with the Constitution. Because we agree Judge Block was correct, we affirm.

## DISCUSSION

### I. Standard of Review.

We review a district court's denial of a habeas petition *de novo*, but we are bound to accept the district court's factual findings save for clear error. *See Ortega v. Duncan*, 333 F.3d 102, 106 (2d Cir.2003). But the Respondent asserts that our review is further constrained by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (codified at, *inter alia*, 28 U.S.C. § 2254). Pursuant to 28 U.S.C. § 2254(d), this Court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim, . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." That is, we cannot grant habeas relief where a petitioner's claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense.

The parties disagree as to whether or not Anderson's claim that his trial violated the standards of the Sixth Amendment to the U.S. Constitution was considered during state court proceedings. The district court did not decide this question and we hold that it is unnecessary for us to do so because even applying the more permissive standard of *de novo* review, we do not

believe that Anderson's petition can succeed.

## II. Did the District Court Correctly Deny Anderson's Petition?

**A. General Limitations Upon Judicial Review of a Jury's Deliberations.** The centrality of the jury to our system of justice, and to our criminal justice system in particular, cannot be emphasized too often. Writing with a degree of enthusiasm for which he is not usually associated, Blackstone asserted that "trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And, if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases!" 3 *Commentaries on the Laws of England* 379 (1768).

In our own country, "[f]rom the earliest possible date, English colonists in the American wilderness enjoyed trial by jury in criminal cases." Leonard W. Levy, *Origins of the Bill of Rights,* 223 (1999). And although the jury's proper province was a central issue of jurisprudential debate at the time of the American Revolution, no one suggested that anything other than trial by jury in criminal cases should be the norm. Thus, "[e]very state that framed a constitution [during the Revolutionary Era] secured trial by jury. No other personal right received protection from the constitutions of so many states." *Id.* at 227. *See generally* Shannon C. Stimson, *The American Revolution in the Law* (1990).

The Sixth Amendment provides that criminal defendants "shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." But it has recently been asserted that, to an extent almost forgotten in contemporary legal and political discourse in America, the jury is what the Bill of Rights *as a whole* was intended to be about:

> Juries, guaranteed in no fewer than three amendments, were at the heart of the Bill of Rights. The Fifth Amendment safeguarded the role of the grand jury; the Sixth the criminal petit jury; and the Seventh, the civil jury.... Indeed, the entire debate at the Philadelphia convention over whether to add a Bill of Rights was triggered when George Mason [of Virginia] picked up on a casual comment from another delegate that "no provision was yet made for juries in civil cases." Between the close of the Philadelphia convention and the opening of the First Congress, five of the six state ratifying conventions that advanced [suggested] amendments put forth two or more jury-related proposals.

Akhil Reed Amar, *The Bill of Rights* 83 (1998); *see also Creating the Bill of Rights: The Documentary Record from the First Federal Congress,* 14–28 (Helen E. Veit, Kenneth R. Bowling & Charlene Bangs Bickford eds., 1991) (collecting amendments proposed by state ratifying conventions).

Professor Amar has also emphasized that the jury was not solely viewed as a means toward protection of the rights of criminal defendants, it was seen as a vital task of citizenship for jurors themselves:

> For the Framers, ... the criminal jury was much more than an incorruptible fact finder. It was also, and more fundamentally, a political institution embodying popular sovereignty and republican self-government. Through jury service, citizens would learn their rights and duties, and actively participate in the governance of society.

Akhil Reed Amar, *The Constitution and Criminal Procedure,* 121–22 (1997).

Shortly after this passage, Professor Amar quotes from the very same passage of Alexis de Tocqueville's *Democracy in America*, which has been relied upon by this Court in dealing with the specific issue concerning juries with which the instant case is concerned: the extent to which a jury's internal deliberations should be free from judicial review. We have said as follows in a case involving a civil jury:

> The American jury system, Alexis de Tocqueville observed, is "as direct and as extreme a consequence of the sovereignty of the people as universal suffrage." Accordingly, the sanctity of the jury room is among the basic tenets of our system of justice. Inquiries into the thought processes underlying a verdict have long been viewed as dangerous intrusions into the deliberative process. They undermine the finality of verdicts and invite fraud and abuse. We thus prevent jurors from impeaching their verdict to guard the jury's special place in our democratic heritage.

*Attridge v. Cencorp Div. of Dover Techs. Int'l., Inc.,* 836 F.2d 113, 113–14 (2d Cir. 1987) (Kaufman, J.) (quoting 1 Alexis de Tocqueville, *Democracy in America*, 293 (Phillips Bradley ed., Vintage 1945)).

Here we arrive at the dilemma presented by Anderson's petition. It is absolutely clear that the Sixth Amendment provides that "[a]ny criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Our Circuit stated seventy years ago that questions of jury coercion "strike[ ] at the root of the right to a trial by jury. No person may lawfully be convicted by a jury unless every juror actually agrees that upon the evidence and the law of the case that person is guilty. If a verdict of guilty is returned for any other reason, it is a perversion of the

constitutional guaranty to a jury trial." *U.S. v. Pleva,* 66 F.2d 529, 532 (2d Cir. 1933).

On the other hand, as we have already noted by quoting *Attridge,* there are universally recognized reasons for shielding jury deliberations from post-trial review. These were set forth by the Supreme Court at least as long ago as 1915:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

This principle is established in the Federal Rules of Evidence. FRE 606(b) broadly prohibits accepting into evidence juror testimony regarding the course of a jury's deliberations. Although the argument is significantly more muted on this appeal, the Respondent argued before the district court that FRE 606(b) served as a virtually absolute bar upon all judicial review of jury deliberations. During the evidentiary hearing, the Respondent made a very stunning reply to a hypothetical posed by Judge Block:

> THE COURT: So if you have twelve jurors and eleven pulled out a weapon and pointed collectively at the twelfth

person's head and said vote guilty or we shoot, you would say that the federal court cannot inquire into that? You don't seriously mean that?.

MR. ROSS: Yes, I do. I know you—I know you think that's outrageous, but yes, I do.

THE COURT: No. I think nine other people in Washington would also think that was outrageous. There has to come a point in time when the Constitution is violated even during the deliberation process. (A 1408–09)

Hearing Transcript at 102–03.

■ In his decision denying Anderson's petition, Judge Block made the following declaration regarding the applicability of FRE 606(b) to Anderson's petition:

The Court's research has not disclosed any reported case concerning the question of whether testimony of physical threats made by jurors against a fellow juror during deliberations is barred by the strictures of Rule 606(b). Because the Court has found that no jurors were physically threatened, the Court need not address this issue. The Court notes, however, that if Rule 606(b) precluded hearing juror testimony when there are credible allegations that a juror's safety was threatened by fellow jurors, it would raise serious constitutional concerns with respect to a defendant's right to a fair trial.

*Anderson,* 206 F.Supp.2d at 360.

■ Although we affirm Judge Block's holding that the issue need not be addressed, we also take this opportunity to state our agreement with his concerns regarding the scope of FRE 606(b)'s preclusion of juror testimony. Indeed, in a case relied upon heavily by the Supreme Court in *Tanner v. U.S.,* 483 U.S. 107, 118–19, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), we upheld "the rule that possible *internal* ab-

normalities in a jury will not be inquired into *except 'in the gravest and most important cases.'* " *U.S. v. Dioguardi,* 492 F.2d 70, 79 n. 12 (2nd Cir.1974) (quoting *McDonald,* 238 U.S. at 269, 35 S.Ct. 783; first emphasis in original; second emphasis added), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). In *Tanner,* the Court specifically refused to decide whether FRE 606(b) may be "interpreted to retain the common-law exception allowing post-verdict inquiry of juror incompetence in cases of 'substantial if not wholly conclusive evidence of incompetency.' " *Tanner,* 483 U.S. at 125, 107 S.Ct. 2739 (quoting *Dioguardi,* 492 F.2d at 80). *See also Shillcutt v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1987) (even after *Tanner,* FRE 606(b) "cannot be applied in such an unfair manner as to deny due process"). It is certainly far from unreasonable to conclude that credible allegations of threats of violence leveled by one juror by another would fall within this exception. *See State v. Vergilio,* 261 N.J.Super. 648, 619 A.2d 671, 675 (1993) ("A verdict of eleven jurors, with the vote of the twelfth coerced rather than convinced is no verdict at all."), *certif. denied,* 133 N.J. 443, 627 A.2d 1147 (N.J.1993).

■ But there is no question that a federal court's review into jury deliberations, even a criminal jury's deliberations is a decidedly limited enterprise. *Tanner* is in fact the leading case. In *Tanner,* a criminal defendant sought a new trial because, after his conviction, his attorney "received an unsolicited telephone call from one of the trial jurors … inform[ing] Tanner's attorney that several of the jurors consumed alcohol during the lunch breaks at various times throughout the trial, causing them to sleep through the afternoons." 483 U.S. at 113, 107 S.Ct. 2739. After the district court denied the motion for a new trial, and while the case

was on appeal, Tanner's attorney received an unsolicited communication from another juror, who described the jury's conduct throughout Tanner's trial as one long scene of dissipation. *Id.* at 115–16, 107 S.Ct. 2739.

The Supreme Court held that no new trial was warranted because FRE 606(b) precluded consideration of the jurors' posttrial statements regarding the behavior of fellow jurors. The Court noted that it had held that FRE 606(b) would not necessarily bar juror testimony concerning *external* influences upon juror conduct. *Id.* at 117, 107 S.Ct. 2739 (citing *Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (testimony concerning bailiff's comments to jurors); *Remmer v. U.S.,* 347 U.S. 227, 228–230, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (testimony concerning bribe offered to juror)). *See also Loliscio v. Goord,* 263 F.3d 178, 185 (2d Cir.2001) (allowing consideration of juror testimony concerning "rumors" some jurors had heard about the defendant because "a criminal defendant's Sixth Amendment rights are implicated when a jury considers incriminating evidence that was not admitted at trial").

But the Court went on to assert that "lower federal courts [have] treated allegations of the physical or mental incompetence of a juror as 'internal' rather than 'external' matters." 483 U.S. at 118, 107 S.Ct. 2739. Admitting the latter into evidence while precluding the former, the Court stated, was wise policy in light of "the necessity of shielding jury deliberations from public scrutiny." *Id.* at 119, 107 S.Ct. 2739. The Court continued:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.

*Id.* at 120, 107 S.Ct. 2739.

The Court did not mean to be understood as stating that allegations of juror misconduct made by fellow jurors, in and of themselves, did not raise Sixth Amendment concerns. On the contrary, it held that "jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict" and that "a party may seek to impeach the verdict by nonjuror evidence of misconduct." *Id.* at 127, 107 S.Ct. 2739 (emphasis in original). *See also Jacobson v. Henderson,* 765 F.2d 12, 15 (2d Cir.1985) (per curiam) (noting that "the absence of any complaints while [the jury was] being polled" supported denial of motion for a new trial); *Pleva,* 66 F.2d at 533 (overturning verdict based upon statement made by juror *during polling of the jury* as to his illness, but "leav[ing] untouched the question of what effect may be given to proof offered, after a verdict is recorded, of what transpired during the deliberations of the jury"). "In light of these other sources of protection of petitioners' right to a competent jury," however, the Court concluded that the district court had not erred in refusing to consider post-verdict statements by jurors in passing upon Tanner's motion for a new trial. *Tanner,* 483 U.S. at 127, 107 S.Ct. 2739.

**B. Anderson's Petition.** The Respondent argues that *Tanner* is fully dispositive in this case because "[a] verdict from jurors who are incompetent either because they slept through the evidence or because they heard the evidence in an altered state of consciousness is qualitatively no different from a verdict that was allegedly ob-

tained through intrajury threats of violence." Respondent's Brief at 41. This is an overstatement. We considered the question of "intrajury threats" more than forty years ago in *U.S. v. Grieco*, 261 F.2d 414 (2d Cir.1958) (per curiam), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). In that case, a convicted defendant sought a new trial because

> five days after the judgment had been entered, one of the jurors, a woman, wrote a letter to [the trial judge] in which she declared that she had wished to vote for acquittal, but being the only juror who did, another juror, a man, was 'very abusive,' so much so that she was 'shaking and crying' when she finally agreed to concur with the rest, and that she now wished to 'retract.'

*Id.* We affirmed the district court's denial of the motion for a new trial because we held that the male juror's conduct only amounted to "blustering arrogance" and was not sufficient to justify a finding that the female juror had been actually coerced into agreeing with the verdict. *Id.* at 415. But we also declared that "[w]e do not say that there can be no threats *short of violence* by one juror against a recalcitrant dissenter that will upset a verdict, but certainly there was nothing in the case at bar to justify such action." *Id.* (emphasis added). Clearly, then, we believed that threats of violence themselves might be sufficient to overturn a verdict.

We considered conduct even more egregious in *Jacobson v. Henderson*. In that case, several incidents of improper jury behavior were cited in support of a habeas petitioner's claim that he had been denied a fair trial:

> It is alleged that, during the course of jury deliberations, there was screaming, hysterical crying, fist banging, name calling, and the use of obscene language. One of the jurors allegedly threw a chair at another, then "broke down," crying and claiming that he was a "sick man." It is further alleged that the jury foreman "refused" to notify the trial judge of these incidents although he was requested to do so by other jurors, and that at one point a court officer upon hearing the noise in the jury room opened the door and asked if anyone needed help, to which the foreman replied: "It's all right, we can handle it."

765 F.2d at 14. The court denied habeas relief, holding that these allegations by themselves were not sufficient to support a holding that the petitioner had been denied a fair trial. The allegations fell short in particular because "the complaining jurors had several opportunities to communicate directly with the court if any of them felt unfairly coerced, harassed, intimidated, or felt themselves to be in physical danger," but none did so. *Id.* at 15. As Judge Block pointed out in his opinion, there is considerable precedent from other Circuits which is analogous to *Jacobson*. *Anderson*, 206 F.Supp.2d at 360–61 (collecting cases).

■ In light of this precedent, we affirm Judge Block's denial of Anderson's habeas petition. Although we acknowledge that Anderson's Sixth Amendment right to a fair trial is at least implicated by the allegations made by Jurors Nos. 2 and 11 regarding the jury's deliberations at his trial, we cannot say that the jury's conduct at Anderson's trial amounted to a violation of those rights. We agree with Judge Block that, at most, Jurors Nos. 2 and 11 felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction. But we do not find that a reasonable juror, standing in the shoes of Juror Nos. 2 and 11, would have thought herself to be facing a physical assault if she refused to vote for conviction.

Our conclusion is buttressed by the fact that, as in *Jacobson*, Juror Nos. 2 and 11 "had several opportunities [during the trial] to communicate directly with the court" concerning whatever threats they felt they faced at the hands of their fellow jurors. Neither availed herself of these opportunities. *Compare Vergilio*, 619 A.2d at 674–75 (conviction reversed where juror advised court of abusive conduct by fellow jurors, but court sent jury back for further deliberations without investigation into substance of complaints). In sum, the evidence in this case amounts to more than "weakly authenticated juror statement[s] containing vague allegations of 'harassment' and 'verbal abuse.'" *Mercado v. Portuondo*, 2000 WL 1663437, at *10 (S.D.N.Y. Nov.3, 2000). But there is insufficient *objective* evidence for us to find that Anderson did not receive a fair trial.

## CONCLUSION

The Sixth Amendment "entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Because the deliberations of the jury that convicted him were clearly something less than a model of rational discourse, it cannot be said that Anderson received a perfect trial. But because the jurisprudence of our system of trial by jury allows us to overturn a jury's verdict only when its deliberations have taken the most egregious departures from rational discourse, we cannot say that he received an unfair one.

The district court's denial of Anderson's petition for a writ of habeas corpus is AFFIRMED.