**UNITED STATES of America**

v.

**Christopher YEAGLEY, Defendant.**

**No. 08–CR–707 (KMK).**

United States District Court, S.D. New York.

March 10, 2010.

Anna Margaret Skotko, Esq. U.S., Attorney's Office, White Plains, NY, for Government.

Michael Howard Sussman, Esq., Sussman & Watkins, Goshen, NY, for Defendant.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge:

A jury has convicted Defendant Christopher Yeagley on narcotics charges. He now requests that the Court hold a hearing to inquire about post-verdict complaints made by one of the jurors. For the following reasons, that request is denied.

*I.  Background*

On December 15, 2009, after a fifteen day-trial, Defendant Christopher Yeagley was convicted on both counts of a two count indictment. Count One charged Defendant with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin from about December 2007 through in or about February 2009. Count Two charged Defendant with distributing and possessing with intent to distribute heroin on or about March 26, 2008. Before rendering its verdict, the

jury deliberated over the course of three days, sent six notes to the Court, and, in response, received face-to-face instruction from the Court, as well as copies of certain witness testimony. After the jury returned a verdict of guilty on both counts, the Court polled each juror individually and each affirmed the verdict. (Transcript, Dec. 15, 2009, at 3–5.) [1] At no point during the deliberations or during the taking of the verdict did any juror voice any complaints or concerns to the Court.

On December 21, 2009, the Court received a letter in the regular mail signed by Juror Number One, in which the juror stated "I voted yes to find [Mr. Yeagley] guilty of the charges although 1 strongly disagreed to his guilt on the second count." [2] Juror Number One explained that "[m]y decision was made due to extreme pressure placed on me by the other jurors." Specifically, the juror alleged that, despite his or her request, the Foreperson refused to "write a note letting the judge know" that Juror Number One wished "to be removed from the jury because of the strong feeling 1 had about the charges on the second count." This refusal allegedly led to "a heated exchange" between Juror Number One and the Foreperson. The juror further contends that "the climate in the jury room was one of extreme frustration and anger at having had to sit through the hearing for so long as well as having to deliberate through the Christmas season." According to the letter, Juror Number One voted to convict on Count Two because the juror "buckled under the pressure not wanting to return to the juror room ... to again experience the badgering and comments that had very little to do with the case." Juror Number One expressed no reservations about the jury's verdict as to Count One.

Within minutes after receiving Juror Number One's letter, the Court sent copies of Juror Number One's letter to both Parties and directed the Parties to submit briefs addressing it. On January 7, 2010, Defendant submitted a memorandum of law requesting that the Court hold a hearing to examine Juror Number One's allegations.[3] Defendant would like the hearing to include testimony from Juror Number One, the Foreperson, and any other jurors that Juror Number One might subsequently identify as having pressured him or her. (*Id.* at 7 n. 2.) The Government responded on January 8,

---

1. The jury returned a special verdict specifically reflecting not only that the jury found Defendant guilty of the Narcotics Conspiracy in Count One, but also that this conspiracy involved at least one kilogram of heroin.

2. Although the juror did provide his/her name, the Court will only refer to him/her as "Juror Number One."

3. In his Memorandum of Law, counsel for Defendant notes that he received a copy of the same letter that Juror Number One sent to the Court, and that he has had no other contact with Juror Number One to date. (Def.'s Mem. 2.) Counsel's decision to avoid contact with Juror Number One in the absence of prior notice to the Court and the Government is sound. *See United States v. Schwarz,* 283 F.3d 76, 98 (2d Cir.2002) ("[W]e have established the requirement that '[a]t a minimum, ... notice to opposing counsel and the court should be given in all cases' before engaging in any post verdict inquiry of jurors." (quoting *United States v. Moten,* 582 F.2d 654, 665–66 (2d Cir.1978)) (alteration and omission in original)). A contrary practice would be unwise, because a "serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts." *Moten,* 582 F.2d at 665; *see also Sattar,* 395 F.Supp.2d at 75–76 (noting that a court may exclude affidavits containing statements from juror obtained by counsel without the court's permission).

2010, and, not surprisingly, opposed Defendant's request.

## II. Discussion

■ "The standard for conducting a post-verdict jury inquiry ... is ... demanding." *United States v. Sattar*, 395 F.Supp.2d 66, 72 (S.D.N.Y.2005), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir.2009). As the Second Circuit has cautioned, "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with merit less applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989). Courts should therefore be reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983). Accordingly, a post-verdict jury inquiry is required only where there is "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *Ianniello*, 866 F.2d at 543 (internal quotation marks and ellipse omitted); *see also Stewart*, 590 F.3d at 133 (same).[4] The Court need not hold a hearing because Juror Number One does not allege that a "specific, non-speculative impropriety has occurred." *Id.* (internal quotation marks omitted). Indeed, even assuming Juror Number One's allegations are true, they do not amount to sufficient "impropriet[ies]" to call the verdict into question.

■ The general rule is that "[a]ffidavits and statements by jurors may not ordinarily be used to impeach a verdict once the jury has been discharged unless extraneous influence has invaded the jury room." *Jacobson v. Henderson*, 765 F.2d 12, 14 (2d Cir.1985) (citations omitted). This rule is codified in Federal Rule of Evidence 606(b), which expressly prohibits the use of a juror's affidavit to impeach a verdict except where the affidavit alleges that the jury was subjected to "extraneous prejudicial information" or improper "outside influence."[5] Fed.R.Evid. 606(b); *see also Jacobson*, 765 F.2d at 15 (relying on Federal Rule of Evidence 606(b) to deny hearing where juror affidavit did not allege "extraneous prejudicial information or outside influence").

Here, Defendant's brief contains conclusory references to the jury being subjected to "extraneous prejudicial information" and "outside influence." But neither Defendant's brief nor Juror Number One's letter alleges anything about outsiders providing jurors with information or in any way attempting to influence the verdict. Instead, Defendant apparently uses "outside influence" to refer to other jurors pressuring Juror Number One to vote for conviction so that those jurors could go home for the holidays. (*See* Def.'s Mem. 4–5 (questioning whether other jurors expressed "a desire to desist from deliberations" and whether "such expression ... create[d] a climate of intimidation or pressure [which led] ... to a verdict based on *'outside pressures.'* ") (emphasis added).)

---

4. Examples of allegations of improprieties that require a hearing include an unidentified person communicating to a jury foreperson that the foreperson could "profit by bringing in" a certain verdict, *see Remmer v. United States*, 347 U.S. 227, 228–30, 74 S.Ct. 450, 98 L.Ed. 654 (1954), a juror being excused after approaching the defendant's co-conspirator, *see Moten*, 582 F.2d at 656–57, 666, and jurors consulting extra-record sources of infor-

mation before rendering a verdict, *see United States v. Calbas*, 821 F.2d 887, 894 (2d Cir. 1987).

5. Although not relevant here, Rule 608(b) also allows parties to impeach verdicts by juror affidavit where "there was a mistake in entering the verdict onto the verdict form." Fed. R.Evid. 606(b)(3).

This is not "outside influence." *See Tanner v. United States*, 483 U.S. 107, 125, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (noting that the Conference Committee Report for Federal Rule of Evidence 606(b) construed "outside influence" as not including "matters occurring during the jury's deliberation, such as the misconduct of another juror"); *cf. id.* ("[J]uror intoxication is not an 'outside influence' about which jurors may testify to impeach their verdict."). Accordingly, under Federal Rule of Evidence 606(b) and *Jacobson*, Juror Number One's letter is insufficient to impeach the verdict.

The Second Circuit has suggested, however, that in extreme circumstances a defendant might be able to use intrajury pressure to impeach a verdict despite Federal Rule of Evidence 606(b). *See Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir.2003) ("[P]ossible internal abnormalities in a jury will not be inquired into except in the gravest and most important cases." (internal quotation marks omitted)). In *Anderson*, the Second Circuit implied that such an exceptional case would be presented if there was an allegation that one juror threatened to physically harm another. *See id.* ("It is certainly far from unreasonable to conclude that credible allegations of threats of violence leveled by one juror by [sic] another would fall within [the *United States v. Dioguardi*, 492 F.2d 70 (2d Cir.1974)] exception [which allows post-verdict jury inquires only in the gravest of circumstances].").

But, *Anderson* also implied, conversely, that an allegation of intrajury pressure that does *not* rise to the level of physical coercion is *insufficient* to require a post-verdict jury inquiry. *See id.* at 324 ("[E]ven though [the complaining jurors] might have experienced severe emotional distress within the jury room ... [the defendant] was tried in conformance with the Constitution."); *id.* at 329 ("Jurors Nos. 2 and 11 felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction. But we do not find that a reasonable juror, standing in the shoes of Juror Nos. 2 and 11, would have thought herself to be facing a physical assault if she refused to vote for conviction.").[6]

At any rate, the Court need not decide whether allegations of non-physical coercion by other jurors could ever require a post-verdict hearing because, wherever the line is, the allegations here, even taken as true, are insufficient to mandate such a

---

6. *Anderson* did quote a 1958 case in which the Second Circuit stated that " '[w]e do not say that there can be no threats *short of violence* by one juror against a recalcitrant dissenter that will upset a verdict.' " *Anderson*, 346 F.3d at 329 (quoting *United States v. Grieco*, 261 F.2d 414, 415 (2d Cir. 1958) (per curiam) (alteration in original)). But, the Anderson Court cited this dicta only for the proposition, which it stated in the very next sentence, that "[c]learly, then, we believed that threats of violence themselves might be sufficient to overturn a verdict." *Id.*

The Court also notes that the trial court in Anderson held a hearing to take testimony from a complaining juror. *Id.* at 318. It is unclear whether the trial judge was aware of the substance of the juror's allegation before taking her testimony. The record states that the juror approached defense counsel "immediately after the trial" and that "the same day" the trial judge asked her "to come in and tell us what is on her mind." *Id.* As it turns out, a hearing was probably appropriate in light of the juror's testimony that "I didn't find him guilty, ... I was pushed into it. Not even intimidated, I felt threatened for my life." *Id.* at 319. Indeed, had the trial court credited this testimony, *Anderson* suggests that the verdict might have been overturned. By contrast, a hearing is not required here, because Juror Number One's allegations, even if true, do not amount to "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *Ianniello*, 866 F.2d at 543 (internal quotation marks and ellipsis omitted).

hearing. Specifically, Juror Number One's complaints are vague and conclusory, alleging "extreme pressure," "badgering," "comments that had very little to do with the case," a "heated exchange," and a "climate in the jury room ... of extreme frustration and anger at having had to sit through the hearing for so long as well as having to deliberate through the Christmas season." Juror Number One does not mention any specific threats, insults, coercion, or verbal assaults that were directed at him or her. Courts have refused to upset a jury's verdict, or even conduct a hearing, despite far more serious allegations of intrajury tension. *See Jacobson*, 765 F.2d at 14–15 (affirming denial of habeas relief where the trial court refused to conduct a hearing despite juror affidavits alleging instances of "screaming, hysterical crying, fist banging, name calling, ... the use of obscene language," and chair-throwing during deliberations); *Sattar*, 395 F.Supp.2d at 71, 76–77 (refusing to hold hearing despite juror's letter declaring that the juror voted to convict "only as a result of the fear and intimidation" caused by "a relentless verbal assult [sic]" during deliberations); *Goode v. Mazzuca*, No. 00–CV–7932, 2004 WL 1794508, at *3, *8 (S.D.N.Y. Aug. 11, 2004) (denying habeas relief where the trial court refused to conduct a hearing despite juror affidavit swearing that she "only voted guilty because of the pressure exerted by the other 11 jurors and her fear for her wellbeing and safety" (internal quotation marks omitted)); *cf. Anderson*, 346 F.3d at 324, 329–30 (refusing to overturn conviction despite finding that the complaining jurors "felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction" and "might have experienced severe emotional distress within the jury room"); *United States v. Grieco*, 261 F.2d 414, 415 & n. 1 (2d Cir.1958) (per curiam) (noting that "certainly there was nothing in the case at bar to justify" reversing a guilty verdict, despite juror testimony that, during deliberations, a fellow juror "kept yelling all the time," "wouldn't let [her] talk," and told her that she had "no commonsense," to the point that she "had chills" and was "sick," "upset" and "practically in a daze"). Therefore, Juror Number One's general allegations, while hardly frivolous, do not meet the high bar which the Second Circuit has set for inquiring into "possible internal abnormalities in a jury." *See Anderson*, 346 F.3d at 327.

Juror Number One's only specific complaint is that the Foreperson refused to write a note letting the Court know that Juror Number One wished to be removed from the jury. Yet, the idea that Juror Number One was somehow prevented from communicating with the Court is contradicted by the record. On several occasions the Court addressed the jury directly, including in response to the jury's notes and to excuse the jury at the end of each day of deliberations. Moreover, Juror Number One affirmed the verdict when individually polled, without raising any concerns about his/her fellow juror's conduct during deliberations. This further undercuts Defendant's request for a hearing, let alone any claim that the verdict is invalid. *See Stewart*, 590 F.3d at 133 (finding trial court's refusal to conduct a juror inquiry justified "especially in light of the fact that the juror had several opportunities to communicate directly with the court regarding any potential improprieties, but failed to do so" (internal quotation marks omitted)); *Jacobson*, 765 F.2d at 15 (finding that "had there been any undue internal influence or any outside influence, the jury had the clear opportunity to bring this to the trial judge's attention," because there were several readbacks and the jurors were individually polled and each affirmed the verdict); *Sattar*, 395 F.Supp.2d at 77 ("[T]hat Juror # 39 had direct access to the Court and

did not complain of any problems supports the conclusion that these allegations are post hoc efforts caused by dissatisfaction that do not require further post-verdict inquiry.").[7]

For the forgoing reasons, Defendant's request for post-verdict jury inquiry is denied.

SO ORDERED.

7. On February 24, 2010, Mr. Yeagley filed a post-trial motion seeking a new trial based, inter alia, on the Court's response to a note from the jury. (Dkt. No. 97.) The note asked whether the jury had to be unanimous on both counts. With the consent of *both* counsel, the Court answered in the affirmative, merely repeating the main instruction that the jury's verdict had to be unanimous. Defendant now contends that, in the Court's answer, it should have admonished the jurors to "hold onto their conscientiously held beliefs." (Mem. of Law in Supp. of Def.'s Mot. to Set Aside the Verdict and For a New Trial 33.) Defendant attempts to weave his after-the-fact objection to the note into his request for a post-verdict hearing regarding juror misconduct by charging that the Court's response to the note may have "support[ed] the coercive atmosphere recounted by [Juror Number One] and of undermining his/her strongly held belief against conviction." (*Id.* at 39.) There was no error in the Court's straightforward and unobjected-to response to the jury's note. Because the note did not suggest that the jury was deadlocked, and the Court did not pressure the jury to break any deadlock, the Court did not need to include a caveat about "holding onto conscientiously held beliefs." Indeed, the Court's general instruction advised the jury to follow the instructions as a whole and not to single out any one component as alone stating the law. At any rate, the Court's response to the note is distinct from the narrow issue addressed here: whether Juror Number One has alleged sufficient pressure from *other jurors* to require the Court to hold a hearing to question those jurors.